NEW-YORK,
May, 1829.

Allen
v.
Sewall.

## S. & M. ALLEN *vs.* H. D. SEWALL and others.

THIS was an action on the case against the defendants as *common carriers*, tried at the Albany circuit, in September, 1827, before the Hon. WILLIAM A. DUER, one of the circuit judges.

The defendants, *eight* in number, were stockholders in an incorporated company called the Dutchess and Orange Steam Boat Company, the stock of which, in all, was held by *thirty six* persons. By the sixth section of the act incorporating the company, it is declared, " that the members of the company shall be liable *individually*, in the same manner as carriers at common law, for the transportation of all goods, wares and merchandise delivered to the agents of the said corporation, and for all contracts which shall be made by such agents relating to the business of the corporation." (*Statutes*, 1825, 48*th sess. ch.* 223.) On the 15th November, 1826, at New-York, the plaintiffs put on board the steam boat *Sun*, a boat belonging to the company, a packet containing $14,347 50 in bank bills, and $1800 in a draft on a bank at Albany, to be transported to Albany and delivered to a cashier of a bank there. The packet was delivered to the captain of the boat, who was informed it was very valuable, and who engaged to take charge of it and deliver it according to its direction. In consequence of some disturbances on board the Sun, she did not leave that day for Albany,

*The owners of a steam boat carrying not only passengers but light freight and parcels for hire, are common carriers, and answerable for all goods shipped on board their vessel, unless lost by inevitable accident or the enemies of the country; and an action for the loss of a packet of bank bills delivered to the captain for carriage, will lie against them.*

*An arrangement between the owners of steam boats and their captains, allowing the avails of carrying bank bills as a privilege to the latter, does not discharge the owners, un-*less the shipper contracts with the captain himself, knowing that he receives the goods on his own account, as part of his privilege, and not in his character of agent for the owners.

Instructions to the captain of a vessel employed in the carrying business not to carry a specific article, i. e. money, does not excuse the owners; unless notice of such instructions is brought home to the shipper.

Bank bills are *goods* within the meaning of the statute incorporating a company, and declaring the members thereof individually liable, as carriers at common law, for the transportation of all *goods, wares and merchandise* delivered to their agents.

Where a carrier is told that a packet containing money delivered to him is a very valuable one, though he is not informed that it contains money, there is no ground for an imputation of fraud or concealment.

There needs no particular agreement for hire to render a common carrier liable, because, where there is none, the carrier may have a *quantum meruit* for it.

The members of an incorporated company made by statute *individually* liable as carriers at common law, are responsible to the same extent and in the same manner as if there was no act of incorporation. A suit brought against them for the loss of a packet entrusted to their agent, should be against all the co-partners, as the action is *quasi ex contractu;* but the non-joinder of all cannot be taken advantage of on the trial, but must be plead in abatement.

NEW-YORK, and the letters and packets which had been put on board of
May, 1829. her, were carried by the captain and put on board of another
Allen steam boat, the *Richmond*, not belonging to the company,
v. which left New-York for Albany that day. The packet
Sewall. was not delivered to the person to whom it was directed. Its
delivery to the captain of the Sun was proved by the testi-
mony of two witnesses. The captain of the Sun, however,
being examined as a witness, denied all knowledge of the
fact, and the captain of the Richmond testified unequivocal-
ly that a packet of the description in question was not
amongst the letters and packets received by him from the
Sun. It is a general practice to send money in *steam boats*,
and the plaintiffs, in the usual course of their business, were
in the habit of thus transmitting money from one place to
another. For the transportation of specie, a fixed price was
paid, which was accounted for to the owners, but for the
carriage of packets of bank bills, a compensation, either- by
the parcel or for the season, was made to the captains, and
the monies thus received, it was testified to by several cap-
tains of steam boats, were considered by them as their per-
quisites, and no account was rendered to the owners.

In 1826, the *Sun* steam boat was employed as a *passage*
and not as a *freight* boat. She carried light freight, howev-
er. For the carriage of boxes, a charge was made, but
none for small bundles. When freight was carried, an ex-
tra. price was charged, and it was considered a favor. Noth-
ing was charged for the ordinary baggage of passengers.
The company did not receive pay for packets carried by the
captain, who was instructed not to carry money, (although
such instructions were not published,) and the captain, to
his knowledge, never did carry money, except remittances,
from the president of the company at New-York, and the
agent at Albany.

The evidence being closed, the plaintiffs waived their right
to recover for the amount of the draft of $1800, but claimed
to recover for the bank bills, with the interest of the same.
The defendants moved that the plaintiffs be nonsuited, 1.
Because the suit should have been brought against the cor-

poration, or against *all* or *one* of the stockholders, and not against *eight* out of *thirty six* stockholders; 2. Because bank notes are *not* goods, wares and merchandize, within the meaning of the charter, so as to render the corporation or the members thereof individually liable as carriers at common law; 3. That the captain of the boat, under the circumstances of the case, was not the *agent* of the company for the carriage of freight, or the making of a contract relative thereto, so as to bind the company or the individual stockholders; 4. Because, if the bank bills were considered goods, wares and merchandise, they were carried by the captain, as *carrier*, and not by the company or stockholders, and he alone was responsible; 5. Because the reception of the packet containing the bills by the captain, was not a reception by him as the *authorized* agent of the company; 6. Because there was no payment or tender of payment for the carriage of the parcel, nor was there any agreement, express or implied, in relation to compensation. These several questions were reserved for the decision of the supreme court upon a case to be made, and a verdict, it was agreed, might be taken for the amount of the plaintiffs' demand, subject to such case, with leave to either party to turn the same into a bill of exceptions or special verdict. The jury accordingly found a verdict for the plaintiffs for $15,268 13.

*H. Bleecker*, for plaintiffs. The non-joinder of the other owners as defendants could be taken advantage of only by plea in abatement. (1 *Saund.* 291, *b. n.* 4.) The act declaring the liability of the defendants as common carriers, makes them liable individually. The suit was therefore necessarily against them as individuals, and could not have been against the corporation.

Bank bills are *goods* within the meaning of the act incorporating the company. They are treated as money, and may be levied on as the goods and chattels of a defendant in an execution. (12 *Johns. R.* 220. 1 *Cranch,* 133.) On principle, it should be so, bank bills representing our circulating medium.

The packet containing the bills was delivered to the captain, the agent of the defendants. It was a proper article

for freight or transportation in a steam boat.  No mode of conveyance could be more safe and expeditious.  A person may be a *common carrier* of money as well as of other property. (11 *Johns. R.* 109.)  The proprietor of a stage coach, who carries goods as well as passengers for hire, is deemed a common carrier, and is liable for the loss of the goods.  (2 *Comyn on Cont.* 294.)  ˙And it was so held in a case of loss of a packet of bank bills.  (1 *Pickering*, 50.)  The defendants knew it was the proper business of the company to carry money, as is evident from their instructions to the captain not to carry it.

It was attempted on the trial to establish that the captains and *not* the owners of steam boats received the compensation for the carriage of bank bills.  Nothing like a usage was shewn, which can affect the plaintiffs.  Thirty years is said to be too short to establish a usage.  (1 *Caines*, 45.)  The captains usually received the compensation ; but supposing the compensation not paid when the service rendered, would not an action lie in the name of the *owners?*  Assumpsit will lie for the carriage of money.  (*Bull. N. P.* 70.  *Impey's Mod. Pl.* 199.)  No agreement was proved between the owners and the captains, that the latter were to receive the compensation for their own benefit ; and allowing an agreement to exist, whereby the captains were to receive such compensation as perquisites, in addition to their salaries, that would not exonerate the owners from their liability as common carriers.  The mode in which the captain is paid for his services does not affect the public.  (*Abbot on Ship. part* 2, *ch.* 2, *s.* 6.  *Cas. Temp. Hardwicke*, 85, 194.  1 *Pick.* 50.)  The case of *King & Mead* v. *Lenox*, (19 *Johns. R.* 235,) where the owner of a ship was held not to be liable in a case of embezzlement, was decided on the ground that the plaintiffs contracted with the master himself, *knowing* that he received the goods on his own account, as part of his privilege, and not in his character as agent for the owners.  Not so here : the packet of bank bills being a proper subject of transportation, the contract was made with the captain, not in his individual character, but as the agent of the defendants, who are responsible for his acts.  (2 *Kent's Comm.* 466.  *Ab-*

*bott on Ship. part 2, ch. 2, sect. 3, 8, 10.*) The instructions to the captain, not to carry money, do not exonerate the defendants from responsibility, notice not having been given. (*2 Kent's Comm.* 484, 5.) Nor does the fact of the captain having delivered over the packet to another to carry, discharge them; they are equally liable for the negligence or misfeazance of their agent. (*5 Barn. & Ald.* 53, 335. 2 *Kent's Comm.* 471.) The notice the captain had was equivalent to being told that the packet contained money; he was informed it was valuable. In the case in *Pickering*, where the carrier was told that the packet contained papers as valuable as money, it was held that such information should have the same effect as if the carrier had been told that it contained bank notes. (*2 Com. on Cont.* 295. 2 *Kent's Comm.* 486. 6 *Co.* 334.) The ignorance of the carrier of the value of the article delivered to him, does not affect his responsibility; he has a right to demand information as to its value, but the owner is not bound voluntarily to disclose it. Unless fraud is practiced by the owner in relation to the value, the carrier is liable. (*Abbott on Ship. part 2, ch. 2, s. 8.*)

*S. A. Talcott,* (attorney general,) for defendants. The plaintiffs ought to have sued *all* the stockholders, or *only one.* The contract here, if any, was *joint,* in which case all must be sued. When it is *joint* and *several,* any one may be sued. (1 *Chitty,* 29, 32, 3.) Where the cause of action resolves itself into a contract, and the party elects to sue in *tort,* all the parties must be joined, for the action is in *form* only in tort. (2 *New Rep.* 365, 454.)

The statute incorporating the company of which the defendants were members, imposes liabilities which did not exist at common law; it is therefore to be construed strictly. The true construction of the clause, "that the members of the company shall be liable *individually,*" is, that each one of the members shall be sued alone. Dr. *Johnson* defines *individual* to be separate from others of the same species, single, numerically one; and *individuality* to be a separate or distinct existence. The statute is either distributive or conjunc-

NEW-YORK,    tive.   If the first, only one can be sued ; if the last, all must
May, 1829.    be joined.

Allen                Bills, notes, drafts, &c. are not goods, wares and mer-
v.            chandise, within the meaning of the statute.   In the common
Sewall.       acceptation of the term, bank bills do not mean goods. *Nos-
citur a socios* may well be applied here ; by the words with
which it is coupled, *goods* means something like wares and
merchandise.   In a count in assumpsit for goods, wares and
merchandize, could a plaintiff recover for bank notes sold ?
A bank bill is defined to be a chose in action, (*Jacob's L.
D. tit. Chattels,*) and it is immaterial how current it is, its cur-
rency does not change its character.   *Prima facie,* the term
goods does not include a chose in action, though for certain
purposes a more extensive signification or interpretation is
given to it, as for the purpose of subjecting an inn-keeper to
liability.   (8 *Co.* 65.)   So, in support of the general policy of
the law subjecting every thing of a tangible nature belonging
to a debtor to the satisfaction of his debts, it has been held that
bank bills were *goods,* and might be taken on execution.   So
also in the case of *bankruptcy* and *waifes,* the policy of the law
gives a general and extended interpretation to the term goods,
and executors and administrators, under that name, take
all that a testator or intestate had in chattels, whether real
or personal ; but as used in this statute, it would be a for-
ced and unnatural construction to make the word *goods* em-
brace bank bills.

The usage of the business of transporting money in steam-
boats is, that *specie* is carried on freight, and accounted for
to the owners of the boats, and packets of *bills* are carried
by the captains, who receive compensation therefor, but ren-
der no account to the owners.   The length of time for which
a usage has existed is immaterial, if it be uniform and has
continued so long as that the parties must be considered con-
versant with it, contracted in reference to it, and virtually
incorporated it into their contracts.   The existence of a
usage for one year, has been held sufficient. (*Doug. R.* 510.
*Park on Ins.* 630.)   Knowledge will be presumed from the
continuance of a usage.   Here, however, the fact is brought
home to the plaintiffs by their practice of sending money by
the captains, and paying them for the service.

Whether the defendants can in this case be considered common carriers, may well be tested by the inquiry, were they bound to carry bank bills ? Common carriers are bound to do what is required of them in the course of their employment, if they have the requisite convenience to carry, and are offered a reasonable or customary price; and if they refuse without some just ground, they are liable to an action. (2 *Kent's Comm.* 465. 2 *Show.* 332. 5 *T. R.* 143. 4 *Barnw. & Ald.* 32. 1 *Ld. Raym.* 654. 1 *Viner. Abr.* 219.) The transportation of bank bills may be part of the business of steam-boats, and the owners may connect it with the carrying of passengers ; but, *prima facie*, it is not so. In this case, it was in fact no part of the business of the defendants. The captain was instructed not to carry money, and he never knowingly did so. A common carrier may limit his business as he pleases. (2 *Esp. Dig.* 250, 2.) And the case in 11 *Johns. R.* 109, where it was held that a person *may* be a common carrier of money as well as of other property, better supports the defendants than the plaintiffs. To make the defendants common carriers, it must be their ordinary business to carry money for compensation for all who choose to employ them. A common carrier is one who carries goods for others indiscriminately, and for hire. (2 *Kent's Comm.* 464.) The defendants were bound for the lawful contracts of the captain, when made by him relative to the usual employment of the steam-boat. Her employment was the carriage of passengers and light freight, exclusive of money, in which the owners had not chosen to engage, and which they had forbidden to their captain. The liability of the owners is based on the employment of the vessel, and the profit which they derive from it. If the vessel was not employed in that business, and no profit accrued from it to the owners, why should they be responsible ? In *Satterlee v. Groat*, (1 *Wendell*, 272,) where the servant or agent was directed *not* to do certain acts in the transportation of goods, the master or owner was held not to be responsible.

A master of a stage-coach is not chargeable for goods lost by the driver, unless the master takes a price for the carriage of the goods ; and though money be given to the dri-

ver, yet that is a gratuity, and cannot bring the master within the custom. (1 *Salk.* 282.) So in this case, had money been paid to the captain for carrying the packet, it would have been a gratuity to him, and no benefit to the defendants. There is no proof that the perquisites arising from the carrying of bank bills were taken into account in fixing the compensation of captains of steam-boats, and that thus the owners were benefitted. Where privileges are allowed to captains of vessels, the owners are not responsible in cases of embezzlement of goods, unless the contract is made with the master, in the course of the usual employment of the vessel by the owner. In 19 *Johns. R.* 235, the court say, "The plaintiffs contracted with the master himself, knowing that he received their goods on his own account, as part of his privilege, and not in his character of agent for the owners." Can there be stronger language? If there can, it is to be found in *Butler* v. *Baring*, (2 *Carrington & Payne*, 613,) in which *Garrow, B.* says, "If persons be foolish enough to send parcels by a waggoner for a hire paid to him, which is never intended to find its way into the pocket of the owner of the waggon, there the owner is not liable in case the parcel is lost."

*A. Van Vechten*, on same side. (*W. Esleeck* also was of counsel for defendants, but did not argue, the rules of court permitting but two counsel to answer.) The word *individually*, in the statute, means *distinctively*. Any one of the members of the company may be sued, and the plaintiff shall not be subjected to a plea in abatement. He therefore may sue *one* or all, but he cannot select out a portion of the members and sue them. Their responsibility is like that of *joint* and *several* obligors; where there are several, any one of them may be sued separately, or an action may be maintained against all jointly. The action here being brought against several of the members and not against all, there is no more need of a plea in abatement, than if an action was brought against several, but not all the obligors of a bond.

The directors of the company have by statute the power to prescribe the duties and define the authority of their agents.

They have done so in this case, and have directed that money should not be carried. On inquiry, it would have been known that such business was prohibited to the captain. The company were common carriers, but not carriers of bank bills.

If the company or any of its members are liable, they are so in consequence of the *hire* received. How were they to ascertain the compensation for the risk incurred, and yet it is said they were compelled to take the article or be subject to an action. The omission to inform the captain of the value of the packet was a fraud which discharged the defendants. Although the members of the company are made liable by the act as common carriers, the legislature never could have intended that the business of the company was to be the carrying of bank bills; nor could it have entered into the contemplation of the company, the compensation paid for such business being wholly inadequate to the risk; nor did the public ever consider the company liable; those who sent money, dealt with the captains, and not with the company.

Although bank notes may be levied on and sold by virtue of an execution, they are not for that reason *money*; they may be *chattels*, but chattels are not enumerated in the act, for the transportation of which the company shall be liable. *Specie*, having weight, may properly be considered as the subject of freight; not so bank bills.

*R. Sedgwick*, said that he appeared in behalf of Mr. Sewall, one of the defendants, and wished to address a single remark to the court. [*Per Curiam.* There being numerous parties, does not alter the rule that but two counsel are to be heard. It is not allowable unless there are separate defences. In this case, however, we will hear you.] The fundamental principle as to the liability of carriers is, that they carry for hire. If the owner of goods pays a compensation to the agent, for the exclusive benefit of the agent, and without the consent of the owner of the vessel or vehicle in which goods are transported, the owner is not liable. (11 *Mass. R.* 99. 15 *Mass. R.* 370.) The cases of notice by

owners that they will not be responsible for goods exceeding a certain value, do not apply here. The doctrine of those cases is, that unless notice of the value of a packet is given, and freight paid accordingly, the owner is not liable as insurer, but is so only as an ordinary bailee, for gross negligence or misfeasance. If those cases applied, the defendants would not be responsible unless gross negligence was shewn on the part of the captain; but they do not, because in all of them it is assumed that *the owners* of the vehicle did receive a compensation for the packages in question as ordinary packages: but here the reward was exclusively to the *captains*, the owners deriving no benefit either directly or indirectly.

*S. A. Foot*, in reply. Money is a subject of transportation, and the case in 11 *Johns. R.* 109, decides that a person may be a common carrier of money as well as of other property. Money is a species of goods and chattels, and *goods* is the broadest term that can be used in the law to designate property. (*Comyn's Dig. tit. Biens.*) The defendants being members of a transportation company, to whom goods were delivered which have been lost, they are liable.

It is admitted the defendants did not receive hire, and that there was no express contract for compensation; but there was an implied contract. The company would have been entitled to have recovered compensation on a *quantum meruit*. The liability of a common carrier does not depend upon the amount of reward to be received, but upon the fact of his receiving or being entitled to compensation for the service rendered.

Whatever may have been the usage of other boats relative to the carriage of bills, it did not extend to the boat of the defendants, which never before carried bills; and it is submitted whether the usage of other boats can have any effect upon the decision of this case.

The Sun was a freight as well as passage boat. The captain with whom the contract was made, was the agent of the defendants; he had no exclusive privilege, and the employment of the vessel is evidence of authority given by the owners to the captain to make contracts for them. On

principle, it is immaterial who receives the hire, whether the captain or the owners. The question is, how do the public understand with whom they contract? Allowing the captains, by an arrangement with their owners, received the compensation for their own benefit, if the public are unapprised of the fact, the owners are liable, unless it is shewn that the contract was made with the captain on his own account, and not as the agent of the owners. The case cited from *Carrington & Payne*, proceeds expressly upon the ground that the owner of the property knew that the compensation did not go to the owner of the stage-waggon. So in the case in 19 *Johns. R.* 236, the contract was with the master in his own right, and not as the agent of the owner. Nothing of the kind is shewn in this case:

Allowing the defendants had a right to regulate their business, still they are liable. The captain was their agent to make contracts for the transportation of light articles. They were common carriers of goods, wares and merchandise. Money is goods; and though the captain was instructed not to carry money, such instructions not made known to the plaintiffs, will not excuse. The defendants cannot discharge themselves from liability by private instructions in relation to an article coming within the general scope of their business.

As to the non-joinder of the other members of the company, the word *individually* in the act incorporating the company, is used in contradistinction to corporate responsibility. The members of the company may be personally sued, and if the defendants wished to have availed themselves of the non-joinder of their co-members, they should have plead in abatement.

*By the Court*, SAVAGE, Ch. J. This is an action on the case against the defendants as common carriers, under the act of incorporation of the Dutchess and Orange Steam-boat Company; the sixth section of which act is as follows : "And be it further enacted, that the members of the said corporation shall be liable individually, in the same manner as carriers at common law, for the transportation of all goods, wares and merchandise, delivered to the agents of the said corpora-

tion, and for all contracts which shall be made by such agents relating to the business of the said corporation."

The plaintiffs were, in the course of their business, in the practice of sending large sums of money in bank bills from New-York to Albany by the steam-boats, and usually by the steam-boat Constellation, Captain Cruttenden. On the 15th November, 1826, the plaintiffs' clerk delivered to Captain Livingston, of the steam-boat Sun, a packet containing in bank bills $14,347 50, and a check of $1800, with a request that he would deliver it to the person to whom it was addressed, at Albany, which he promised to do; and being informed that it was very valuable, locked it up in a drawer in his office. The Sun did not sail that day, and the letters and packets put on board of her were sent by the Richmond steam-boat. The packet in question never reached its destination, but was lost; and several questions are raised : 1. It is said that a suit will not lie against the defendants, being a portion of the stockholders; that it should have been brought against all the stockholders, or against one individual. I apprehend it was the intention of the legislature to put the defendants upon the same footing as to liability, as if they had not been incorporated. Individual liability in the act must be understood in contradistinction to corporate liability, and the defendants must therefore be held responsible to the same extent, and in the same manner as if there was no act of incorporation. The plaintiffs undoubtedly might have sued the corporation, but they had their election under the sixth section of the act to consider the association an unincorporated copartnership. It is true that the plaintiffs should have brought their suit against all the copartners, as this is an action *quasi ex contractu;* but this error of the plaintiffs can be taken advantage of only by plea in abatement. The defendants' counsel have indeed referred us to some of the cases in which it was decided that want of joining all the partners as defendants might be taken advantage of on the trial upon the general issue, but the practice has been otherwise since the case of *Rice* v. *Shute,* (5 *Burr.* 2611.) It was there held, that the non-joinder of all the partners, defendants, must be pleaded in abatement. " A creditor

knows," says Lord Mansfield, "with whom he dealt, but he does not know the secret partners. He may be nonsuited twenty times before he learns them all, or driven to a suit in equity for a discovery who they are." (1 *Saund.* 291, *b. n.* 4, 5 *Bos. & Pul.* 364, 2 *Bl.* 947, and *Seymour* v. *Minturn,* 17 *Johns. R.* 174, in which the point was conceded upon the argument.) In the latter case, Spencer, Ch. J. says, "The objection could have been taken only under a plea in abatement. The case of *Rice* v. *Shute,* which has never been questioned, is decisive."

2. The plaintiffs having abandoned so much of their claim as relates to the check of $1800, the next question is, whether bank bills are "goods, wares and merchandise." The term *goods* is synonymous with personal chattels; and "*bona et catalla,*" it is said, although they do not, of their proper nature, extend to charters and evidences concerning free-hold, or inheritance, or obligations, or other deeds or specialties, being things in action, yet in the case of an inn-keeper's liability, they do extend to such obligations; "and if one brings a bag or chest of evidences into the inn, or obligations, deeds, or other specialties, and by default of the innkeeper they are taken away, the inkeeper shall answer for them, and the writ shall be *bona et catalla* generally, and the declaration shall be special." (8 *Co.* 65.) Money hath been accounted to be goods and chattels; though things in action are not generally accounted goods and chattels. (*Jacob's L. D. tit. Chattels.*) This court has considered bank bills money, and held that as such they may be levied on by an execution. (12 *Johns. R.* 220.) Money is there decided to be goods and chattels; "and it appears to us," says Spencer, J., "to comport with good policy as well as justice, to subject every thing of a tangible nature, excepting such things as the humanity of the law preserves to a debtor, and mere *choses in action,* to the satisfaction of the debtor's debts." Here the court expressly distinguish between bank bills and choses in action, calling the former *money ;* and that a person may be a common carrier of money as well as of other property, is decided, 11 *Johns. R.* 109.

Allen
v.
Sewall.

The liability of the defendants is, by the statute, the same as that of common carriers, and common carriers are responsible for the safe delivery of all goods entrusted to them or their agents or servants, unless the loss is occasioned by the act of God or a public enemy. (11 *Johns. R.* 109.) There needs no particular agreement for hire to render a common carrier liable, because, when there is none, the carrier may have a *quantum meruit* for it. (2 *Show.* 129.) Nor is there any ground for an imputation of fraud or concealment as to the contents of the packet. In some of the cases cited, there seems to have been a fraud practised in concealing the fact that money was sent, and such fraud exonerated the carrier. Thus, in *Gibbon* v. *Paynton*, (4 *Burr.* 2300,) £100 was concealed in a bag with hay ; the price for carrying money was three pence per pound, and the coachman, the defendant, had given notice that he would not be accountable for money unless he was informed that money was delivered to him to be carried. Lord Mansfield held the defendant not liable, no notice having been given that money was sent by him, and the plaintiff being cognizant of the defendant's advertisement as to the terms on which he would agree to be liable. So it was said by King, Ch. Justice, (1 *Str.* 145,) "If a box is delivered generally to a carrier, and he accepts it, he is answerable, though the party did not tell him there is money in it. But if the carrier asks, and the other says no, or if he accepts it conditionally, provided there is no money in it, in either of these cases I hold the carrier is not liable." In this case, the plaintiffs' clerk told captain Livingston that the packet was a very valuable one ; no objection was made to carrying it on that account ; it was received. Nothing was said at the time about compensation. The practice was either to receive compensation upon delivery of the packet, or at the end of the season.

3. The principal point, therefore, is whether the money in question was delivered to the captain of the Sun as the *agent* of the defendants ?

It is not denied that captain Livingston was the general agent of the defendants in relation to the common and ordinary business of the steam-boat Sun. That boat carried pas-

sengers and light freight, and it was the general practice of all the steam-boats which carried passengers to carry money. It seems to have been a general understanding between the proprietors and the captains, that when specie was carried, the freight went to the proprietors; and when bank bills were carried, the captains received the compensation without accounting for it. This arrangement seems to have been general among the steam-boats, but no notice of such an arrangement was ever published; nor was such notice ever given to the plaintiffs. In both cases the captains received the payment; in one case they accounted for what they received, in the other they did not. Can this be any thing more than a private arrangement by which the captain's compensation is ascertained? Suppose, by arrangement between the captain and the proprietors, and known to no others, he was to receive all the pay for small freight, could that discharge the proprietors from their liability? Certainly not, unless the owner of the goods knew that the captain received them on his own account, as part of his privilege, and not as agent for the owners. It was said by Holt, Ch. Justice, in *Middleton* v. *Fowler*, (1 *Salk.* 282,) "that this action did not lie against the master, and that a stage coachman was not within the custom as a carrier is, unless such as take a distinct price for carriage of goods as well as persons, as waggons with coaches; and though money be given to the driver, yet that is a gratuity, and cannot bring the master within the custom; for no master is chargeable with the acts of his servant, but when he acts in execution of the authority given by his master, and then the act of the servant is the act of the master." The facts contained in the case before lord Holt were, that the plaintiff took a seat in a coach and delivered his trunk to the driver who promised to take care of it, but lost it. From the manner in which Holt expresses his opinion it was evidently not a case in which money was paid as a reward for the service rendered; he speaks of a gratuity to the driver, which must have been for a service not connected with his duty as driver. The case is very briefly reported, but probably, in England as in this country, the proprietors had given notice that they would not be liable

for the baggage of the passengers, and had made no charge for it; and then indeed, though money be given to the driver, that would not charge the proprietors. It is, however, useless to speculate upon the various cases cited on the argument. The fact of the plaintiffs' liability for freight to the proprietors is, I think, unquestionable. The boat was theirs, the captain was in their service upon wages, not as a charterer; and how he received his wages, seems to me no more a matter of concern to the plaintiffs or the public than the amount of those wages. It is of no consequence whether the master is rewarded for his services by wages paid by the owner, or by receiving part of the earnings of the ship. (*Abbott, pt.* 2, *ch.* 2, § 6.) The rule deduced by Abbott in the above section is, that the owners are bound by every lawful contract made by the master relative to the usual employment of a general ship. By the Roman law a distinction was taken as to contracts which the owners authorized the master to make and those which they did not authorize; but, in general, they were answerable for all acts of which character and situation afforded the presumption of authority, even if he contravened the orders received from them, unless the party with whom he contracted were acquainted with the orders by which his authority was restrained. (*Abbott, pt.* 2, *ch.* 2, § 3.) Upon similar principles this court decided the case of *King* v. *Lenox,* (19 *Johns. R.* 235, 6:) " The owner of a ship is bound for the lawful contracts of the master when made by him relative to the usual employment of the vessel, both on the ground of such employment and of the profits which they derive from it, and the course of usual employment is evidence of authority given by the owners to make a contract for them. The plaintiffs in this case," say the court, " contracted with the master himself, knowing that he received their goods on his own account, as part of his privilege, and not in his character as agent for the owners." " The ship was freighted wholly by the owner, and the master had no authority from the defendants to receive goods on freight." That case, it will be perceived, was very different from this; the ship was not a general ship, but wholly freighted by the owner. The master

had a privilege which was *known to the plaintiffs*, and he shipped his goods as part of the master's privilege ; he dealt with the master on his own responsibility, not as agent for the owner. There is no evidence in the case now before us that the plaintiffs knew any thing about the captain's privilege, or that they contracted with him on his individual liability and not as agent for the owners. Besides, the steamboat Sun was a *general* ship : she was not laden by the owners, nor were they any of them managing the concerns of the lading of the vessel ; the captain and no other person had control of that business.

The cases of *Walter* v. *Brewer*, (11 *Mass. R.* 99,) and *Reynolds* v. *Tappan*, (15 *id.* 370,) contain no principles opposed to those which I have considered sound. The former was in some respects like the case of *King* v. *Lenox*. The defendant was owner of the ship and loaded her himself. She was not a general ship, and the goods for which the plaintiff prosecuted were taken on board clandestinely during the temporary absence of the defendant. The court held that the owner was not liable for goods clandestinely taken on board by the master, the owner being present and having the management of the voyage himself, leaving nothing to the master but the care of sailing and directing the ship herself; and especially where the ship is not a freighting ship, and when the shipper might have known the limited authority of the master. In the latter case it was decided that the owner is not liable merely because he is owner, but it must appear that the vessel was in his employment, and that the master was appointed by him and acted within the scope of his authority. In that case the owner was sought to be charged for losses sustained when the vessel was chartered to another, and employed by the charterer. And it was there held that the owner is never liable unless the master was authorized to carry goods for hire. In the case now before the court I consider the facts abundantly shewn that the Sun was a *general* vessel. She carried not only passengers but goods for hire. The secret instructions given to the captain not to take money cannot avail the defendants, notice of such instructions not having been published or brought home to the

knowledge of the plaintiffs. His general situation was that of general agent—master of the vessel, which carried goods for hire ; the presumption, therefore, without notice to the contrary, must be that he was clothed with the usual authority of a master of a *general* vessel ; and as such it cannot be doubted that the owners are bound by his lawful acts within the scope of his general authority. The cases cited by the defendants' counsel from 4th and 5th *Barn.* and *Ald.* are cases where notice had been given by the owners, which qualified their responsibility. The case of *Satterlee* v. *Groat*, (1 *Wendell*, 272,) is not an authority for the defendants. There the defendant was not considered a common carrier, but one who had sent his team upon a special contract. The case of *Dwight* v. *Brewster*, (1 *Pick.* 50,) is more in point, where it was held that the practice of carrying parcels not belonging to passengers for hire in a stage coach, constitutes the proprietors common carriers ; and that notice that the parcel was as valuable as money was equivalent to saying that it was money.

On the whole, therefore, it seems to me that the law is with the plaintiffs. The defendants being owners of the boat of which Captain Livingston was master ; having appointed the master of the boat ; the boat being in the employment of the defendants ; being a general vessel ; carrying not only passengers but light freight and parcels for hire, the defendants are common carriers, and answerable for all goods shipped on board their vessel, unless lost by inevitable accident, or the enemies of the country. The general custom prevailing among the captains and proprietors of steam boats, to allow the avails of carrying bank bills to captains as a privilege, cannot avail the defendants, 1. Because there could be no such rule between them and Captain Livingston, if he never carried money ; and 2. Because, if he did carry money, the proprietors are bound by the acts of their general agent, and this arrangement was only the mode of paying him his wages. All the cases cited in which the owners are held not liable by the acts of the master, are those in which the ship was not a general ship, but was freighted by the

owners, and the master contracted to carry, as part of his privilege, and this known to the shipper.

I am, therefore, of opinion that though this may be one of those cases, in the language of Lord Mansfield, " *quod durum videbatur circumstantibus,*" (4 *Burr.* 2301,) yet that well established principles decide it against the defendants, and that the plaintiffs are entitled to judgment.