JOHN M. GILMORE et al. *vs.* JAMES L. CARMAN, survivor, &c.
use, &c.

Sm.& M
1sm279
78   14

The owners of steamboats, engaged in the carrying trade, are common carriers, and liable as such.

They are insurers against all losses occasioned by accidents, not within the exceptions of law, or which are not excepted by special contract.

Common carriers may obviate the rigor of the law applicable to them, by inserting the proper exceptions in the bill of lading.

A loss, occasioned by accidental fire, not arising from negligence or carelessness, is not within the exception of a loss caused by " act of God."

Fire is not one of the dangers of the river; a loss, therefore, occasioned by fire on board of a steamboat, will not be covered by these words in the bill of lading : " the dangers of the river, only, excepted."

THIS case was tried in the Warren circuit court, upon the following state of facts.

The defendants were partners and owners (with one A. Auter, not sued in this action) of the steamboat called the Vicksburg, at and before 26th December, 1837, which boat carried freight and passengers for reward, from Vicksburg to New Orleans and back; that on the said 26th day of December, 1837, Mr. Pendergast shipped at Vicksburg, Mississippi, for and on account of Carman & McMahan, thirty-two bales of cotton, which cotton was shipped on board said steamer Vicksburg, to be delivered to said Carman & McMahan, at the port of New Orleans. The bill of lading, signed by the captain and master of said steamboat, is in the words and figures following :

" Shipped, in good order and conditioned, by M. Pendergast, on board the good steamer called the Vicksburg, whereof A. Auter is master for the present voyage, now lying in the port of Vicksburg, and bound for New Orleans, thirty-two bales cotton, (M) being marked and numbered as in the margin, and are to be delivered in like good order and condition, at the aforesaid port of New Orleans, (the dangers of the river, only, excepted)

unto Messrs. Carman & McMahan, or to their assigns, he or they paying freight for the said cotton, at the rate of as customary. In witness whereof, the clerk of said steamer hath affirmed to three bills of lading, all of this tenor and date, one of which being accomplished, the others to stand void.

" A. AUTER."

" Vicksburg, 26th day of December, 1837."

It is further agreed, that after said boat received said cotton on board, she started on her voyage to New Orleans, when, on the morning of the 29th December, 1837, whilst proceeding on her voyage to New Orleans, said boat took fire by accident, and all the cotton on board, including the above-named thirty-two bales, was burnt up; whereupon, the said A. Auter, the captain and master of said boat, as aforesaid, made the following protest, on the back of said bill of lading :

STATE OF MISSISSIPPI, WARREN COUNTY,
January 10th, 1838.

I, Abraham Auter, late master of the steamboat Vicksburg, do hereby certify, that on the morning of the 29th December last past, whilst proceeding on my voyage to New Orleans, said boat Vicksburg, being captain thereof, said boat took fire, and all the cotton on board, of the brand of the within bill of lading, was burnt up, and totally destroyed; and I do further certify, that the thirty-two bales of cotton marked (M) as per within bill of lading, were on board said boat when she was burnt.

A. AUTER.

The above sworn to before me, January 10th, 1838.

E. H. MAXY, J. P.

It is further agreed, that said fire was entirely accidental; when the fire was discovered the boat was immediately run ashore, and every exertion made to save her, but the progress of the flames was so rapid, that none of the cotton could be saved, and the clerk, from the dense smoke entering the cabin, had great difficulty in saving the cash and papers of the boat. The

Gilmore et al. *v.* Carman.

cause of the fire was not known, but it was supposed to have originated from sparks from the furnace, as it commenced about the middle of the boat, near the boilers. All due vigilance and care was used on board by Captain Auter, and her officers, for the protection and safety of the property on board of said boat. Captain Auter was a part owner of the boat, and only part of her was insured; which fact, in connexion with a principle of duty, caused him to use the utmost care and vigilance as commander. Nothing was deficient in the careful management of the boat, and great care was used by Captain Auter and his officers, in managing the concerns of the boat generally.

It is further agreed, that the fire was not caused by lightning, or other act of God, or by the enemies of the country, but was accidentally produced from sparks from the furnace, or lighted candles on board the boat. It is further agreed, that the value of the cotton, at the time it was burnt, was twelve hundred and eighty dollars.

Now, if from the foregoing facts, the court should be of opinion that the law is for the plaintiffs, and that defendants are liable in law, for the value of said cotton, then, and in that case, judgment is to be entered up for the plaintiff against the said defendants, for the sum of $1698 $\frac{13}{100}$, being the aforesaid amount of $1280, and legal interest thereon, together with costs of suit. But if the court is of opinion that the law is for the defendants, then, and in that case, judgment is to be rendered for the defendants, with costs, &c.

The court below, gave judgment for the defendants in error, for $1698 $\frac{13}{100}$, and to revise that judgment, this writ of error was prosecuted.

The errors assigned in this court, are,

1. That the court erred in its judgment upon the agreed state of facts; the judgment should have been for plaintiffs in error.

2. If the defendants in error were entitled to a verdict and judgment, for the cotton lost, they were not entitled to interest upon its value.

3. The defendants in error should have deducted the amount of the freight from their claim.

*W. C. Smedes*, for plaintiffs in error.

The agreed state of facts in this case, present the questions involved in so small a compass, that we will not undertake to abbreviate them.   Upon these facts, three points present themselves to the consideration of the court.   1.  Whether or no, the owners of a steamboat, carrying goods for hire, are common carriers, and as such, subject to their rigorous liabilities?   Upon this point, there has been a diversity of judicial opinion.   The case of *Aymar* v. *Astor*, 6 Cow. 266, deciding that they, or rather ships conveying freight for reward, from New Orleans to New York, are not common carriers, seems, however, to stand almost alone, and is, itself, reversed by *Allan* v. *Sewall*, 6 Wend. 335.   That the owners of ships are common carriers, is decided in 4 Binn. 127.  1 Com. Dig. 415.  4 Green. 411.  10 Johns. R. 8.  11 Johns. R. 109.  8 Johns. R. 216.  6 Johns. R. 178. 1 Bay. 99.  2 Sum. R. 197, 567.  4 Munford, 445.  So also, of a steamboat.  4 Bing. R. 607.  2 Wend. 327.  9 Ib. 85.  A carrier by water, whether by inland navigation or coastwise, from port to port, or to and from foreign countries, is a common carrier, and liable as such.  3 Kent's Com. 216.  2 Kent, 601. Story's Bailments, 323.   We presume, therefore, the court will regard that question as settled.

The second point to which we call the attention of the court, is one apparently embraced in the position already conceded.   It is, are carriers by water, in this country, liable for losses occasioned by accident, without the least negligence on the part of the carriers, and which have not been caused by act of God or the king's enemies?  such as accidental fires, &c.   We admit the English rule with reference to land carriers, to be well settled.   In *Forward* v. *Pittard*, 1 Term. Rep. 27, the court of king's bench held that a common carrier by land, was liable for loss by accidental fire; and the authorities, since that case, are all in support of it.   But no case is reported in the English books, in which the owners of a ship or of a steamboat, have been held liable for loss by fire, because, shortly after the decision in *Forward* v. *Pittard*, parliament perceiving the ruin that would ensue upon the application of the principle of that decis-

Gilmore et al. *v.* Carman.

ion to carriers by water, passed the act of 7 Geo. II. c. 15, exempting common carriers by water, from liability for losses by fire. The general and only exceptions, however, in the common law and custom of the realm of Great Britain, to the liabilities of common carriers, are losses occasioned either directly or indirectly, by act of God or the king's enemies. And as Judge Hale, in *Morse* v. *Slue*, decided that the owners of a vessel plundered in the river Thames in the night time, by an armed mob, were liable for the damage, because not in one of the exceptions, we suppose, the elementary books are right in saying they would have so held in case of loss by fire at sea. 2 Kent's Com. 605. Story's Bailments, 323. Ab. Ship. p. 3, c. 4, § 1. They did not, however, so decide; and although in New York, in the cases referred to above; (in Massachusetts, in 5 Mass. R. 1; 8 Mass. R. 321, and 8 Pick. 22; 11 Pick. 41. In Pennsylvania, 8 Serg. & Rawle, 833; 4 Bin. 127; 2 Watts, 443. In Maine, 4 Greenleaf, 411. In South Carolina, 2 Nott & McCord, 88;) and in numerous other cases not necessary to enumerate, which we have examined, the courts have adopted the English rule, and applied it in all its rigor, to carriers by water; in none of these cases have they applied it to a loss by fire, and especially where there was not only no negligence, but the " utmost skill and care." We say, therefore, in this State, the question may be considered an open one. It never has been decided by the English courts, and the principle of the decision never been applied, although adopted, by many of the American courts. We do not think it necessary to press this question here, because it will arise under the discussion of the third point which we shall make in this case, and upon which we shall rely for the reversal of the opinion of the *puisné* judge; and that is, that a loss by fire, occurring on board of a steamboat engaged in the carrying business, not attributable to want of skill or care, is one of the " dangers of the river," and is embraced within the exception in the bill of lading.

Before entering upon the immediate discussion of this point, it will materially aid the investigation, to present and bear in mind a brief history of the law upon the subject of the liabilities

of common carriers in England. Originally, when England, notwithstanding her insular position, had but little commerce with foreign countries, and as little within its different parts, the rule applicable to common carriers, was the same as applied to any other bailee for reward—they were liable only for negligence. This was the common law as late even as the reign of Henry VIII. Jones on Bailments, 103. As England, however, became more commercial, the law tightened its grasp, until in the case of *Forward* v. *Pittard*, already referred to, and of *Hyde* v. *The Trent and Mersey Navigation Company*, 5 Term. R. 387, it was recognized in all its rigor. While, however, the courts of justice were thus expounding the law and enlarging its onerous burthen, public sentiment exacted of parliament a corrective, which was accomplished by the act passed in the reign of George II. and which relieved from liability, in case of fire on board of any ship or vessel. Attempts were made still further to reduce the liability of common carriers, but failed. Ab. Ship. p. 3, c. 4. In all other respects, the law in England is the same with regard to carriers by water that it is by land. The same progress of opinion and process of argument, that demanded of the legislature an amelioration of the rigid liability of the carrier by water in England, has been felt in this country—and in applying its principles, some of our most distinguished judges have done so with reluctance. In the case of *Orange County Bank* v. *A. Brown* et al. 9 Wend. 114, the judges, in commenting upon the law, say that " the liability of a common carrier is rigorous in the extreme—was established in a rude age, and courts do not incline to extend its operation." In *Boyce* v. *Anderson,* 2 Peters, 135, the court says, " the law applicable to common carriers, is one of great rigor. Though to the extent to which it has been carried, and in the cases to which it has been applied, we admit its necessity and policy ; we do not think it ought to be carried further, or applied to new cases." See, also, 10 Johns. R. 8. We have thus traced the history of this branch of the law of bailment in the English law— to ascertain to what extent, and in what cases it will be applied here. The law passed, 7 Geo. II. exempting carriers by water

from liability for losses by fire, took effect in the year 1734; forty-two years prior to our separation from the mother country, and more than one hundred and nine years ago. The common law of this country is the same with that of Great Britain in all points where it is not inconsistent with the policy of the country and its peculiar institutions. As the common law originally stood, common carriers were liable only for negligence; as the law on that subject in the colonies at the time of the separation was, masters of vessels were not liable for losses by fire. This principle had become incorporated in the practice of the country. It governed and controlled both shippers and carriers. The whole commerce of this western country, nay, this whole western country itself has had its rise, progress, and attained its present stand, since the law and uniform usage under it, exempting carriers by water from such liability, had an existence. The country has known no other law—been governed by no other usage. Will this court be the first to aim so destructive a blow at the shipping and carrying trade of the Mississippi valley, and, by applying a principle, which, in its application, has slept for more than a century, to a case heretofore, by positive enactment, not considered within its perview, bring ruin upon thousands of its most enterprising citizens? We will refer to this subject again in arguing that point, which we have reserved as the strongest and most conclusive.

3. We say, that the phrase in the bill of lading, " dangers of the river only excepted," embraces, in its broad scope, that which occasioned the loss in this case; fire, without negligence, on the part of the carrier. The view we take is reasonable and not unsupported by authority. The universal acquiescence of the country in this view of the matter, is an argument in support of it. Among the many instances that have occurred of the destruction of boats and their cargoes by fire, not one case, except in Louisiana, has been made the subject of adjudication. At least, none of them have fallen under our notice.

This universal acquiescence is indicative of general, if not judicial, interpretation of the law. In the absence then of cases directly in point, we will have to reason from analogous ones.

Story, in his work on Bailments, and also in the case in 2 Sum. Rep. 567, in which he delivered the opinion of the court, seems to doubt about the extent of meaning of the phrase, "perils of the sea," as found in ancient charter parties and bills of lading. It certainly embraces something beyond the act of God, and the king's enemies, otherwise it would be superfluous. In fact it means so much more than those exceptions, that, upon the familiar maxim of "*Expressio unius exclusio est alterius*," it has been even questioned, whether, where a bill of lading had been taken excepting the perils of the sea, a loss happening by the king's enemies at sea, was or not excluded. *Bever* v. *Tomlinson*, East. 7. 36 Geo. 3. Ab. Ship. 256.

Its precise limitation is not yet accurately fixed. Cases as they rise, are brought within its scope, or excluded, as the views of judges accord, or differ. But from a comparison of cases decided upon that subject, we think the definition given by Judge Story, in his work on Bailments, 332, of the more extended sense of the phrase, correct, viz : "Such losses only to the goods on board as are of an extraordinary nature, or arise from some irresistible force, or from some overwhelming power, which cannot be guarded against by ordinary exertions of human skill and prudence." Story, Bail. 331–2. There must be no negligence, either passive or positive, imputed to the carrier. It is upon this construction and application of the principle, that a loss occasioned by two vessels running afoul of each other at sea, is embraced in the expression, "Perils of the sea." It being neither by act of God, or the king's enemies, *Thompson* v. *Whitmore*, 3 Taunton, 227 ; and that, too, even though the collision and consequences be wholly attributable to the negligence and misconduct of the crew of the other ship. *Smith* v. *Scott*, 4 Taunt. 126. So if a vessel is lost at sea, it is presumed to be of the "perils of the sea." *Green* v. *Brown*, 2 Strange 1199. So piracy is one of the perils of the sea. 1 Roll Abr. 248. So also Robbery. Park, 103. Although it would be otherwise if the exception were not in the bill of lading. *Morse* v. *Slue*, 1 Vent. 190. Although generally embraced in policies of insurance by special words, yet they would have been covered

by the phrase, perils of the sea. Park, 103. *Nesbitt* v. *Lush-ington*, 4 Term R. 100. So also a loss occasioned by mutiny of the crew. *Brown* v. *Smith*, 1 Dow, 369. 1 Phillips, Ins. 258. So also, loss by rats gnawing a hole in the bottom of the vessel, if the captain has along with him a cat, which is requir-ed to remove the suspicion of negligence. This being supposed to render the loss inevitable. 1 Phil. Ins. 251. 4 Camp. 203. Story's Bail. 332. It has in Pennsylvania, been so decided, even though no cat be along. *Garriques* v. *Cox*, 1 Binn. 592.

Phillips, in his work on Insurance, describing what is the ex-tent of the meaning of the phrase, perils of the sea, says, " Under perils of the sea, which constitute part of the risks, in almost every marine policy, are comprehended those of the winds, waves, lightning, rocks, shoals, running foul of other vessels, and, in general, all causes of loss and damage to the property insured, arising from the elements and inevitable ac-cidents, other than those of capture and detention." 1 Vol. Phil. Ins. 249. So it was thought by some of the judges of England, that when a vessel was fired into, under a mistake that she was an enemy's vessel, by a king's ship, and was thereby sunk, that it was a peril of the sea. *Cullen* v. *Butler*, Park, 105. So if a carrier ship, mistaking a man-of-war for an enemy's vessel, con-ceal her papers, and is taken in tow by the man-of-war, and is strained, by the stress of sail she is compelled to wear to keep up, to her cargo's injury, it is a loss by perils of the sea. 1 Stark. Rep. 137. So where seamen are impressed, and thereby the vessel lost. 5 Bos. & Pul. 336. From these and similar cases we take the doctrine to be, that wherever a loss is occasioned by an inevitable causality at sea, without negligence on the part of the carrier, he is excusable. " They are liable for every in-jury that might have been prevented by human foresight and care." 6 Johns. Rep. 178, but no other. Is the loss in the present case, one occasioned by inevitable casualty on the river, without " *levissima culpa*" on the part of the carriers ? We say inevitable casualty on the river, from analogy to the English cases above referred to, making perils at sea equivalent to perils of the sea. What are the facts ? We quote from the

record. " The cause of the fire was not known, but it was supposed to have originated from sparks from the furnace, as it commenced about the middle of the boat near the boilers. All due diligence and care were used by Capt. Auter and his officers, for the protection and safety of the property on board of said boat. Capt. Auter was a part owner of the boat, and only part of her was insured, which fact, in connection with a principle of duty, caused him to use the utmost care and vigilance as commander. Nothing was deficient in the careful management of the boat, and great care was used by Capt. Auter and his officers in managing the concerns of the boat generally."

If all " due dilligence and care" were used; if " the utmost care and vigilance" were exercised; if " nothing was deficient in the careful management of the boat," surely the accident was inevitable, and is within the definition of Phil. Ins. 1 Vol. 249, above quoted. But the phrase, " dangers of the river," is a stronger phrase in its application to this case, than that of the perils of the sea, in the English books. The navigation of the Mississippi river is almost exclusively by steamboats. Fire and steam are essential elements to its navigation; without them the boat could not be propelled; without them, there could be no transportation. The danger from explosions and of fire, are almost the only " dangers of the river." The universal custom of shippers and of carriers, in this country, is so to regard it, and the absence of adjudged cases, and the silence of the law in its application to this particular point, conduce to establish the views for which we contend. It is part of the history of the country, and as such judicially known to the court, that several hundred, perhaps it would not be going beyond the truth to say thousand, steamboats have been destroyed with their cargoes by fire, and yet the master and owners not been held liable in any case that has come under our observation in a diligent review of all the English and American decisions that we could find on the subject.

In *Fairchild* v. *Slocum*, 19 Wend. 329, the " dangers of the lake" were excepted in the bill of lading. The judge, in deciding the cause, determines that negligence on the part of the car-

riers must be proved. " It is conceded," says the judge in his opinion, " that the defendants are only answerable for a loss happening through want of that diligence which is usually exercised by men engaged in navigating the lake." " They were only bound to ordinary care."

In *Gordon* v. *Buchanon*, 5 Yerger, 82, the court say, " The exception in this bill of lading, of ' the dangers of the river, which are unavoidable,' narrows down the liability of the owner of the boat. Many disasters, which would not come within the definition of the act of God, would fall within the exception in this receipt. Such for instance as losses occasioned by hidden obstructions in the river newly placed there, and of a character which human skill and foresight could not have discovered or avoided."

*Turney* v. *Wilson*, 6 Yerger, 343. The exception of the dangers of the river exempts the carrier from liability for those losses, which could not have been prevented by human skill and foresight. 5 Yerger Rep. 82. But it was incumbent on the defendant to prove that the loss in this case did occur from such cause. Peck Rep. 271.

Story in his work on Bailments, page 367, lays down the following general principle, in language broad enough to cover the case at bar ; " If from the nature of the goods carried, they are liable to peculiar risks, and the carrier takes all reasonable care, and uses all proper precautions to prevent injuries, and if notwithstanding they are destroyed by such risks, he is excusable." The application of this principle is easy. The cotton from its nature is peculiarly inflamable—from the construction of steamboats, it is exposed to peculiar dangers from fire, and if destroyed, when " all reasonable care is taken, and all proper precaution used to prevent injury," by reason of this peculiarity, is not the carrier excused?

Certainly horses carried on board of ships or steamboats, are not more liable to the danger of breaking down the partitions between them, and kicking each other to death, *Lawrence* v. *Aberdeen*, 5 B. & A. 107, nor oranges and fruits to decay, *Brind* v. *Dale*, 8 Carr. & Payne, nor oil to evaporate and leak from its

cask, *Hastings* v. *Pepper*, 11 Pick. R. 41, than cotton when necessarily, and by the shipper, exposed to the action of fire, is to burn.

In Louisiana, where the civil law prevails, the question we have been discussing, has been directly decided. *Hunt* v. *Morris*, 6 Martin donis. Rep. 676. It was held that the owners of a steamboat destroyed by fire, were not liable to the freighters, if proper diligence was used. We admit that the law, governing the tribunal that delivered this opinion, is not as rigid in regard to the liability of carriers, as the common law. But the reasoning of the court is so forcible, in its application to this case, that we cannot forbear quoting it. " The plaintiff," says the court, " thought fit to place his goods on board of a steamboat, which, being propelled through the agency of fire, must, from the nature of things, be more exposed to destruction by that element, than boats which are so by the application of ordinary powers." Thus bringing the case precisely within the principle laid down by Justice Story, quoted above in page 367 of his work on Bailments, and clearly exempting the carrier from liability, if " all reasonable care, and all proper precaution be used."

The second error which we have assigned is, that, even though the appellees were entitled to the value of the cotton lost, they were not entitled to interest upon that value. We consider the case of *Watkinson* v. *Laughton*, 8 Johns. Rep. 216–17, to be fully in support of this assignment of error. In that case, the suit was instituted to recover the value of some goods, shipped at Liverpool for New York, and which had been embezzled on the voyage, or otherwise lost, without any fraud on the part of the defendant. The court say, " The question of interest depends upon circumstances. The jury may give interest by way of damages, in cases in which the conduct of the master was improper. But here no bad conduct is to be imputed to him, and interest is not in every case, and of course recoverable, because the amount of the loss is unliquidated, and sounds in damages to be assessed by the jury." The court proceed to reduce the verdict accordingly; the agreed

Gilmore et al. *v.* Carman.

state of facts in that case, as in the one before the court, exhibiting the value of the cotton and the interest separately.

We refer also to this case in support of the third error assigned. The court say distinctly, "the plaintiff ought to deduct the charges for freight, and which he would have paid had the goods arrived, and take only the net price without interest." 8 J. R. 217. *Hammond* v. *McClure*, 1 Bay, 99. *Patton* Admr. v. *McGrath* et al. Dudley's Rep. 162.

*George S. Yerger*, for defendant in error.

This was an action brought against the defendants, as owners of a steamboat called the Vicksburg, for cotton burnt by accidental fire, on its passage to New Orleans.

A bill of lading was signed, which contains the usual exception, that the cotton should be delivered in New Orleans, "the dangers of the river only excepted." The facts were agreed in the court below; it was admitted that the captain used ordinary care and diligence, and that the fire was wholly accidental. The cause of the fire was not known, but was supposed to have originated either by sparks from the furnace, or from lighted candles in passengers' rooms.

The court below gave judgment in favor of the plaintiffs, and the defendants sue out their writ of error.

1. That the owners of steamboats upon our inland waters, are common carriers, and liable for all losses, except the acts of God or the enemies of the country, is settled beyond dispute. (Story's Bailments, 323. 2 Wendell, 327. 3 Ib. 158. 13 Ib. 611. And cases cited 2 Watts, 443. 1 Dudley's Law and Equity Rep. 159.) And many of the cases hereafter cited in other courts. That a common carrier is in the nature of an insurer, and is liable for robberies or accidental fire, although no negligence is imputable to him, unless it be fire produced by lightning, is too well settled to argue. In this case, therefore, only two questions can arise. First, whether the words, "dangers of the river excepted," embrace a case of accidental fire, originating, no body knows how; and, second, if they are embraced, whether the policy of the law will give them effect, or permit such a stipulation to stand?

1. Is an accidental fire on a steamboat, or any other boat, "a danger of the river," within the meaning of these words?

Without such exception, it is clear that an accidental fire, without the slightest negligence on the part of the carrier, would not avail as an excuse, in the case of a steamboat. *Harrington* v. *McShane*, 2 Watts, 443. Administrators of *Patton* v. *McGrath & Brooks*, Dudley's Law and Equity Rep. 159. Story on Bailments, 330.

It is confidently believed, that the exception in a bill of lading, "dangers of the river," cannot, by any strained construction, be made to embrace a loss by fire.

Although the precise import of the phrase, "peril of the seas, or dangers of the river," is not accurately defined, yet, in a strict sense, they denote the natural accidents peculiar to the river, or to the sea. (Story on Bailments, 330.) It also embraces losses on the sea by pirates, or collision with other ships. (Ib. 331.)

But whether it is understood in its most limited sense, as importing a loss by natural accidents peculiar to that element, or, whether understood in its more extended sense, as including inevitable accidents occurring upon that element, it must, still, in either case, be understood to include such losses only, as are of an extraordinary nature, or arise from irresistible force, or from some overwhelming power which cannot be guarded against by the ordinary exertions of human skill and prudence. Story on Bailments, 331, 336. 2 Sumner's Rep. 567, 197.

In 1 Phillips on Insurance, p. 635, "perils of the sea" is defined to be losses by winds, waves, lightnings, rocks, shoals, running foul of other vessels; and, in general, all causes of loss and damage arising from the elements and inevitable accidents.

An insurer against the "perils of the sea," would not be responsible for accidental fire; hence, if fire is insured against, it is always inserted in the policy. It is specifically insured against, and never has been considered as embraced in the words "perils of the seas." 1 Phillips on In. 630–31.

In 3 Stewart & Porter Rep. 177, it is said "perils of the sea" denote the natural accidents peculiar to this element. But an

exception to this definition is omitted in cases of pirates. That has been adjudged a peril of the sea. A loss by fire, proceeding from any other cause than lightning, is considered as chargeable on the ship owner.

See also as to the meaning of the words "perils of the seas," 21 Wendell, 200. *Gordon* v. *Buchanon,* 5 Yerger, 71. *Turney* v. *Wilson,* 1 Yerger, 340.

The above definitions clearly exclude a loss by fire.

There is not, indeed, there ought not to be, any difference between a loss by fire on a steamboat, or any other boat. Suppose a flat boat is accidentally burned from fire; would this be a danger of the river? Suppose a steamboat be burnt from lighted candle in a state room; would this be a danger of the river?

And if it is burnt from sparks from the furnace, it is still a stronger case against him; for then it is produced by the very means he himself has selected to propel his boat. It is, however diligent the captain himself may be, a loss by negligence to permit the boat to be burned by the fire employed in propelling it. It can always be guarded against with proper vigilance and attention, and by not stowing combustible materials near the furnaces.

In Dudley's Rep. 159, the steamboat was accidentally burned; no one could tell how the fire originated, and there was no proof of negligence in the management of the boat.

The court in that case say, "a loss by fire, occurring in another boat, which renders the owner liable, will, in like manner, make the owner of a steamboat, propelled by fire, liable."

The court further adds, "that the carrier who undertakes to carry for freight, through the extra danger of fire engines, can, with less reason than other carriers, plead that the loss was occasioned by an unavoidable misfortune, where it has been caused by the very means he has, himself, introduced into the hull of his boat, and for which, he must, on that account, be more clearly liable."

I ask the attention of the court to the whole of this case.

From the foregoing authorities, I conclude, that if fire on a

steamboat is produced by the sparks from the furnace, or the means used in propelling the boat, it is not a peril or danger of the river.

But, if it were, the owner would have to bring himself within the exception. It surely cannot be pretended that a fire, originating from carelessness of others, or of the boat hands, is within the exception. The proof is, the captain was a careful man, and there was no negligence on his part; this will not excuse him, if his boat is fired by candles in the state room, or by his hands carrying candles under the deck of the boat, or amongst the cotton. If he, therefore, seeks to avoid responsibility, he must show the fire originated from the furnace, without any fault of her crew, and by means that could not be avoided.

The law is thus laid down in 2 Bailey's Rep. 157: "in actions against carriers, it is sufficient for the plaintiff to show her goods were damaged." It lies upon the carrier to show that the damage was occasioned by causes which exempt him from responsibility. It is not enough that he has used the utmost care and diligence. But,

3. Suppose the exception, in express terms, did embrace a loss by fire; can the carrier by contract, exempt himself from a loss produced by fire? He cannot; it is against the policy of the law. The law not authorizing it to be inserted, may be changed by the legislature. But, by the principles of the common law, a carrier cannot absolve himself from responsibility by such a clause, or by notice. He may, by contract or notice, require the party to inform him of the nature, value, &c. of the articles, and if not so informed, that he will not be liable.

But he cannot, by contract, absolve himself from responsibility as a carrier. He cannot force such terms upon the freighter.

The whole of this subject was elaborately examined in regard to notices of carriers, &c., in the case of *Cole* v. *Goodwin*, 19 Wend. 251.

But this very point, whether a carrier could, by exception or contract, absolve himself from loss by fire, was decided by the supreme court of New York, in 2 Hill's Rep. 623.

In that case, it was decided that such an exception was illegal and inoperative.

*W. C. Smedes*, in reply.

1. The case of *Gould* et al. v. *Hill* et al. in 2 Hill's Rep. 623, decided in New York, in May, 1842, and since our previous examination of this case, it is said is directly in point, and conclusive against us. We will frankly admit, that the decision in that case, while it is extraordinary and anomalous, if it be the law, is decisive of the question. But we do not hesitate " to grapple the bull by the horns," and bold as may be the undertaking, we aver, and will prove, that justice Cowan's opinon in that case, is without foundation in principle, and is not only unsupported by authority, but is in the very teeth of well settled adjudications, both in Great Britain and all the States of the union, and is at war with every principle of law and every deduction of reason. Before entering upon an investigation of that case, it will be well enough to observe that the decision came from a divided court, chief justice Nelson dissenting.

This divided court decides that " common carriers cannot limit their liabilities, or evade the consequences of a breach of their legal duties as such, by an express agreement, or special acceptance of the goods to be transported. Accordingly, where common carriers, on receiving goods for transportation, gave the the owner a memorandum, by which they promised to forward the goods to their place of destination, danger of fire, &c. excepted, held that they were liable for a loss by fire, though not resulting from negligence." *Gould* et al. v. *Hill* et al., 2 Hill's Rep. 623.

Judge Cowan (the same judge who, in opposition to the Senate of the United States, in the face of the opinion of the Hon. John J. Crittenden, their attorney general, and the elaborate report of the distinguished secretary of state, Daniel Webster, delivered the opinion on the application for a writ of *habeas corpus*, by McLeod) in this case, either deeming the principle too insignificant for re-investigation, or the subject too involved and laborious for second examination, contents himself with a brief opinion and reference to the case of *Cole* v. *Goodwin*, 19 Wend. 281, wherein, in a case not at all presenting the point

now at issue, in a matter wholly *coram non judice*, he delivered an elaborate opinion, deciding important and vital interests, that were not presented by the record, and were passed *sub silentio* by the counsel and the other judges.

We are therefore driven back to the case of *Cole* v. *Goodwin, supra*, and the reasoning of the court there, for the ground work of the decision in 2 Hill, 623.

The right of carriers, by general notice, as well as special acceptance, to limit the extent in value of their liability, is not questioned—indeed, is directly admitted—19 Wend. 268–69–70–71. The grounds of the decision then are, that to authorize the carrier to limit the nature of his responsibility, is contrary, first, to public policy, because "it opens the high road to fraud, perjury, theft and robbery." 19 Wend. 280. Since if the carrier is only made liable by special contract for negligence, his servants and agents being, from necessity, the only witnesses, they will, at every hazard, screen their employers from loss, (19 Wend. 272,) and by perjury will exonerate their principals from the effects of their frauds or thefts. And, second, is contrary to law—the only exemption to the liability of common carriers, being losses occasioned by the act of God and the king's enemies—" and there being no adjudication of a date anterior to the American revolution, which sanctions the frittering away of the responsibility of a common carrier by exceptions, provisos, special acceptances, notices or otherwise, for his own exclusive benefit, and having no respect to the duties of the bailor," 19 Wend. 279, upon these two positions "hangs all the law" of this case. If we succeed in removing both of these props, the opinion must fall.

If, in response to the first position, we show that the reasoning and argument establishing it, apply as well and as forcibly to the common law exceptions of "losses by the act of God or the king's enemies," and to the admitted exception as to the extent in value of liability, then we will conclude, "*ratione cessante, cessat et ipsa lex*," and that in inferring a public policy, and deducing therefrom a law, in the face of well settled adjudications to the contrary in England, and an overwhelming mass

of adverse authority in this country, embracing in its scope the judicial sanctions of judge Cowan himself, and the supreme court of New York, then, I say, we will conclude that judge Cowan acted hastily and unadvisedly, and suffered his views, as to what the law should be, to warp his judgment in concluding what the law actually was.

And if in response to the second position, we show that, long before the American revolution, and even before the English revolution, that placed William and Mary upon the throne, the common carrier's liability was like that of any other bailee for hire, subject to action only for negligence, and that when by adjudication, its rigor was enhanced, till, by the common law and custom of the realm, it knew of but two limitations; and that when almost the first case of an action based upon this common law liability arose, where there was no negligence, even in the time of the First Charles, the distinguished judge who tried the case, chief baron Hale, said, (*Morse* v. *Slue*, 1 Vent. 190,) "If the master would, he might have made a caution for himself, which he, omitting, and taking in the goods generally, he shall answer for what happens," and thereby directly admitting and deciding, that the carrier might, by contract, limit his common law responsibility; that even at that early day (in the time of Charles I.) the bills of lading and marine charter parties excepted the perils of the sea, thus going beyond the common law exceptions, and that the whole custom of England, and the current of English decision since the case of *Froward* v. *Pittard*, 1 Term Rep. 27, fixing the full rigor of the common law, has been to relax that rigor by special contracts, and that prior to the decision of judge Cowan, in *Cole* v. *Goodwin*, no case is to be found, in England or America, taking the position that such limitations are void; that long anterior to our revolution, throughout all England and America—then, of course, colonies of Great Britain—by the act of 7 Geo. II., c. 15, owners of vessels were exempted from liability for losses by fire, and finally, that a long and unbroken line of American cases, in one uniform train, accord with and uphold the English cases; then we will again conclude, that the premises of judge

Cowan being erroneously taken, however logical may be his deductions, his conclusions also will be erroneous.

1. It is said to be contrary to public policy to permit carriers to limit their responsibility within reasonable bounds, because, when a loss happens, the only proof of the mode by which that loss occurred, must, from the nature of things, come from the agents of the carrier, who, being themselves *participes criminis*, will be tempted to commit perjury to screen the fraud and theft, as it may be, of their principal. This, we believe, covers the whole ground. It is a public policy, not deduced from the custom and universal understanding of the people to whom it is applied, and on whom, whether for good or ill, it must bear, for their custom and view of the law and its policy is directly the reverse; nor is this newly discovered policy, built up by a long train of judicial decision, giving color, character and consistency to its application—for the settled law of the country is in the very teeth of this assumed policy. The court does not pretend to base its decision either upon custom or law, but upon reason. " The frittering away the responsibility of the carrier," strikes the court with horror. The exposing the frail morality of carriers and their agents, to the awful temptation of perjury, and its attendant ills, fills them with alarm, and wise " above what is written," they adjudge it shall not be done. And yet the very common law itself makes an exception to the carrier's responsibility, that exempts him from liability in case of loss by act of God and the king's enemies, and that exposes to the same temptation of perjury, the carrier and his agents. How, if in a tempestuous night, a steamboat be struck with lightning and destroyed, while in its ordinary navigation, can the destruction be distinguished from an accidental fire on the same night, originating from the boat itself? Or if the boat be driven by the wind against a snag and sunk, or be carried by the current and the propelling steam against the same snag, and meet with a like fate. In the one case the owner would be discharged, and in the other liable on the selfsame testimony. Why are not the witnesses in both cases equally exposed to the temptation of perjury and fraud? Undoubtedly they are so; and the same process of reasoning that

Gilmore et al. *v.* Carman.

brings the mind to the conlusion that the one case ought to be excluded, will equally apply to the other. But judge Cowan also admits, that they may limit their liability as to amount, but not as to nature. This admission is equally as fatal to his argument as the common law exception. Suppose goods known by the carrier to be greatly worth more than the extent of his limited liability, all he has to do is to appropriate them to his own use, and bring forward these same agents, so exposed to the sin of perjury, and who, if they would swear falsely in one case, would do so in all others, *falsum in uno, falsum in omnibus,* and so the carrier would reap the reward of his villany. We will pursue what is so evident no further.

2. Judge Cowan says that there are no decisions in England anterior to the American revolution, justifying the carrier's limiting his liability, and but few decisions to that effect in this country, some of which he professes to enumerate, with what extent of research we will undertake presently to show. With all the labor exhibited in the opinion in *Cole* v. *Goodwin,* the judges were unable to find a single case in England to go the lengths they have gone. On page 269 of the opinion, 19 Wend. are enumerated the most of the English decisions on the subject of limiting the liability of common carriers, and we fearlessly rest this portion of the argument on those decisions; many of them were long anterior to the revolution, and fully acknowledge the right of the carrier to limit his liability in extent; and as soon as he attempted to limit it by contract, (beyond the limitation perils of the sea, which is nearly as old as the common law itself,) after the decision in, *Forward* v. *Pittard,* rendered it advisable and essential to do so, in its character, the English courts all upheld him in it, and the American courts have followed and sanctioned the English decisions.

We refer to the following English cases as fully sustaining the position we contend for : *Evans* v. *Soule,* 2 Maule & Selwyn, 1. *Latham* v. *Rutley,* 2 Barn. & Cres. 20. *Leeson* v. *Holt,* 1 Stark. Rep. 186. *Maving* v. *Todd,* 1 Stark. Rep. 72. *Johnson* v. *Benson,* 1 Brod. & Bing. 454. *Riley* v. *Horne,* 5 Bing. 217. *Beck* v. *Evans,* 16 East. 244. *Lyon* v. *Mells,* 5 East. 439. *Sleet* v. *Fogg,* 5 Barn. & Ald. 342.

The exception, "dangers of the seas," is to be found in bills of lading as old as Charles I. *Pickering* v. *Barkley,* Style, 132. *Lex Mercatoria Rediviva,* by Beawes, 126, published in 1750, with the form of the bill of lading. 2 Rolls. Abridg. 248. The famous case of *Coggs* v. *Bernard,* 2 Lord Raymond, 909, was decided as late as the year 13 William III., by Chief Justice Holt; and no one can possibly investigate the history of the English law upon the subject of common carriers, without being convinced that, from its earliest application, the right of the carrier to except certain perils, has been admitted, sanctioned, acted upon, and confirmed in every possible way, and never denied until Judge Cowan ventured to do so. Law Library, vol. 19, 78. 1 vol. Smith's selected cases, 97. The case of *Pickering* v. *Barkley,* 1 Style, 132, was decided in the year 1687, and determined that the exception, perils of the sea, in a charter party, embraced loss by pirates. The case of *Morse* v. *Slue,* 1 Vent. 190, was decided in 1672, and determined that by the common law, a loss by pirates was not within the exceptions of act of God, or king's enemies; but Chief Justice Hale said, the owner might have made his condition, and as he did not, he must answer for it. Petersdoff's Abridg. vol. 5, 375. Bacon's Abridg. 2 vol. title carrier.

In addition to the above English authorities, we add the following American cases, all based upon, and all deciding the carrier's right by express contract to limit his liability. *Hand* v. *Baynes,* 4 Wharton, 204. *Marsh* v. *Blythe,* 1 McCord, 360. *Marsh* v. *Blythe,* 1 Nott & McCord, 170. *Gordon* v. *Buchanon,* 5 Yerger, 71. *Turney* v. *Wilson,* 7 Yerger, 340. *Dwight* v. *Dwight,* 1 Pick. Rep. 53. *Bean* v. *Green,* 3 Fair, 422. *Barney* v. *Prentiss,* 4 H. & J. 317. *Williams* v. *Branson,* 1 Murphy, 417. 1 Car. Law Rep. 224. *Spencer* v. *Daggett,* 2 Verm. 92. *Aymar* v. *Astor,* 6 Cowan, 266. *Jones* v. *Fletcher,* 3 Stewart & Porter, 176. *McGregor* v. *Kilgore,* 6 Ham. 361. *Gordon* v. *Little,* 8 Sergeant & Rawle, 533. 2 Binney, 72. *The Reeside,* 2 Sumner, 568. *Bird* v. *Cromwell,* 1 Mis. 81. *Ewart* v. *Street,* 2 Bailey, 157. *Steamboat Company* v. *Bason,* Harper, 262. *Atwood* v. *The Reliance Transportation Company,* 9

Watts, 87. *Harrington* v. *McShane*, 2 Watts, 443. *Fairchild* v. *Slocum*, 19 Wend. 329. *Hunt* v. *Morris*, 6 Martin, Lou. Rep. 676. *Hammond* v. *McClure*, 1 Bay. 99. *Craig* v. *Childres*, Peck. Rep. 271. *Elliot & Stewart* v. *Russell & Lewis*, 10 Johns. Rep. 8. *Shieflin* et al. v. *Harvey*, 6 Johns. Rep. 171. 4 Munford, 445. *Pattons* Admr. v. *McGrath* et al. Dudley, 159.

From this brief enumeration of some of the American cases, it is at once apparent, that if anything can be settled in law by adjudication, this question is forever put at rest, the divided court of New York to the contrary notwithstanding. It is worthy of remark, that in the very volume in which *Cole* v. *Goodwin* is decided; the case of *Fairchild* v. *Slocum*, is reported by the same court, and clearly holding a contrary doctrine. 19 Wend. 329.

2. The case of the *Administrators of William Patton* v. *John McGrath* et al., Dudley's Law and Equity Reports, 159, does not militate against any position we have assumed in this argument. It only determines what, by the common law, was the liability of steamboat owners, as common carriers; that it extended to the destruction by fire of goods shipped on board their boats. But, on the contrary, the court in delivering its opinion expressly says: "Need I remind the owners of steamboats that they have but to give public notice, that they will not be liable in a certain class of cases; and to deceive no one, give no other bill of lading, but with the express exception written, 'not to be liable for accidents by fire,' and they then make the desired exception the law of the contract. If there be then any grievance from the severity of the law, they hold the remedy at their own discretion. And I would here apply to all carriers, who inveigh against the severity of the law, which, for general purposes, is wise, the same observation. They may and will relieve themselves, whenever essential to their interests, by special acceptances." Dudley's Rep. 163.

*Williams* v. *Moore*, 1 Murphy, 417, and *Jones* v. *Pitcher*, 3 Stew. & Porter, 136, relied upon, by counsel on the other side, simply determine that dangers of the river mean the natural accidents incident to the navigation of the river. They neither

of them question the right of the carrier to make the limitation; they both maintain and uphold it; and in so doing militate directly against the doctrine of *Gould* v. *Hill,* 2 Hill, 623.    *Bird* v. *Cromwell,* 1 Miss. 87, and *Ewart* v. *Street,* 2 Bailey, 157, can have no application to this case; in neither instance was there a bill of lading taken, in neither was the loss in a mode similar to that in the case at bar.

The decisions in South Carolina, principally relied upon by the other side, are by no means consistent with themselves, or with the law.    The case of *Evelyn* v. *Sylvester,* 2 Brevard, 178, reverses the doctrine of most of the other cases, and applies the principle of the decision of *Aymar* v. *Astor,* 6 Cow. 266, to inland water carriers.    It puts them on the basis of ordinary bailees for reward, and holds them liable for simple negligence only, relieving them from the burthensome rigor of the common law.    We do not quote this case as absolutely authoritative, but simply to show the conflict in opinion in the same court on this question; and the inclination of the judicial mind to soften the harshness of laws, that had their origin in a rude age, and which the enlightened jurisprudence of modern times has uniformly, with the single exception of *Gould* v. *Hill,* endeavored, and that, too, effectually to ameliorate.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The defendants in error brought this suit to recover the value of thirty-two bales of cotton, shipped to New Orleans, on the steamboat Vicksburg, which was consumed by fire on her downward trip; the plaintiffs in error being the owners of the boat.

There can be no doubt but what the owners of steamboats engaged in the carrying trade, on the navigable rivers, are to be regarded as common carriers.    It is their business or calling, to transport merchandise and other articles, from one port to another, for a price or compensation.    It appears that the boat on which the cotton was shipped, was engaged in carrying freight from Vicksburg to New Orleans and back, for compensation.    In pursuing this as a general business for the accommodation of those having articles to ship, the owners became liable as com-

mon carriers, and so it has been held by numerous adjudications directly on this point. *Allen* v. *Sewall,* 2 Wend. 327. *Orange Bank* v. *Brown,* 3 Ib. 158.    13 Ib. 611.    11 Pick. R. 41.

Being common carriers, they are liable for all losses except those which have occurred by inevitable accident resulting from the act of God, or those which may have resulted from public enemies of the country. The owners are the insurers against all losses occasioned by accidents not within the exceptions of law, or which are not excepted by special contract. This, although not the rule of the civil law, is undoubtedly the rule of the common law, and it is now universally enforced in England, except in cases where it has been changed by act of parliament.

Some few of the States of this confederacy may have modified it by legislative enactment, but where no change has taken place, the common law prevails. Story on Bailments, 318, § 489. 3 Kent's Com. 216, 3d ed. *Harrington* v. *McShane,* 2 Watts R. 443. *Pattons* admr. v. *McGrath & Brooks,* 1 Dudley's R. 159. 5 Yerger, 71. This rule may seem rigorous, and yet it rests upon reasons sufficiently strong to afford, at least, a very plausible excuse for its adoption—reasons, too, which may be still urged with great force in favor of its utility. But as to its policy we have nothing to say. We received it as part of the common law, and the legislature has not thought proper to change it. Besides, it is easy to obviate the rigor of the law by inserting the proper exceptions in the bill of lading.

It is not necessary that we should enumerate all the accidents falling within the exceptions of this rule; it will be sufficient for our present purpose, to determine whether a loss by fire, constitutes one of them. ' It would seem that what are called inevitable accidents, can only arise from natural causes, and such is generally the case, though there may be a few exceptions. The criterion, it seems, is, that if it be such an accident as no human foresight or sagacity could have prevented, then the loss will be excused. 3 Kent, 215. In boats propelled by steam, it may be difficult to prevent conflagration, and no doubt is so; but, surely, such accidents cannot be said to be beyond the power of human skill and prudence. Steamboats are occasionally consum-

ed by fire, yet for the number of boats, the instances are few; and when we consider the great danger to steamboats from that cause, and the great number liable to that danger, we must ascribe to human skill and prudence, a powerful agency in preventing a more frequent recurrence of such accidents.    But on this branch of the subject, too, the books speak but one language. Chancellor Kent says, "A loss by lightning is within the exception of the act of God; but a loss by fire, proceeding from any other cause, is chargeable upon the ship owner." 3 Kent's Com. 217.    The same is the case where the vessel is propelled by steam.    The case of *Harrington* v. *McShane*, above cited, was to recover damages for a loss which was caused by the burning of a steamboat on the Ohio, and the owners were held responsible for the loss.    The case of *Pattons* admr. v. *McGrath & Brooks*, was an action for the value of a quantity of cotton burned on board of a steamboat.    It appeared that proper diligence had been used, but still the owners were held liable. There was also an attempt to defend the action on the ground that usage or custom exonerated the owners in such cases, where they had used proper diligence.    The court held that no distinction could be taken between steamboats and other vessels; that all were alike liable in such a case; and that custom, to constitute an exception to the rule of law, must have been immemorial, certain, and reasonable.    These decisions fully sustain the rule of the common law, to its full extent, in its application to steamboats, by placing them on the same footing, and entitled only to the same exceptions with other vessels, and we are not aware of any decision to the contrary, except in Louisiana, under the civil law.

Loss by fire, then, is not a loss by an inevitable accident, which will protect the owners under the law.    Are they protected by the exceptions in the bill of lading?    It may be true, that although the law will hold the owners liable for a loss, yet they may be exonerated by the exception in their contract.    The exception in the bill of lading is in these words: "the dangers of the river, only, excepted."    This exception does not seem to be sufficiently broad to cover any casualty which is not peculiar to

the navigation of that river. It is like the exception in bills of lading given by vessels navigating the sea, in which " the perils of the sea" are the words employed; by which natural accidents, peculiar to that element, are meant. Accidents which do not happen by the intervention of man, and which cannot be prevented by human prudence. 3 Kent's Com. 216. This general exception in a bill of lading, seems to mean very much the same things that are excepted by the law itself, being no other than inevitable perils on that element, for which the owners would be excused, even without a bill of lading. Story on Bailments, 330. But suppose the exception in the bill of lading is entitled to a more extended meaning, and that there are dangers in navigating the river, which fall properly within the exception, which would not be reached by the law, still we find nothing to justify us in saying that the danger of fire is one of that character. It is not a danger which proceeds from, or is peculiar to the river. It arises from the means used in propelling the boat, and not from any obstacle or impediment in the river. The boat itself is the depository of the agent which produces its own destruction. If the owner chooses to employ this agent, he cannot, with propriety, say that it is productive of a danger incident to the navigation of the river. This is a danger produced by human agency; it may be counteracted by human sagacity and prudence. The vessel itself may be constructed so as to be free from danger; or if not, prudence, in keeping up a sufficient watch, affords a guaranty for safety. The arrangement of the cargo, with a view to its security, is also calculated to diminish danger. Hence we conclude that a loss by fire does not fall within the exception in the bill of lading. That all proper diligence was used, does not alter the case. A want of diligence might throw the loss on the owner, even in cases when the law would otherwise excuse him; but the use of diligence does not excuse a common carrier. There is no condition in the law by which he shall be excused if proper diligence be used. He is excused by nothing but accidents resulting from the act of God, or the public enemies of the country, unless he has taken the precaution to protect himself by contract.

Gilmore et al. *v.* Carman.

It is insisted in argument, that the judgment ought to be reversed, because interest was improperly allowed.   This objection is met by the argument by which the court was authorized to enter judgment for a certain sum, which was the amount of principal and interest.   The court did enter judgment for the amount agreed on.   It is also said that the defendants below are entitled to their freight out of the amount recovered.   That is true, if it has not been paid ; but they made no claim to it in the court below, and cannot urge it here as an error in the judgment.

Let the judgment be affirmed.