Horace Johnson *v.* The Concord Railroad Corporation.[*]

Where one purchases of a railroad corporation a ticket for passage to a station on its line, in the absence of express stipulations he becomes entitled to be carried over the railroad to that station in a reasonable time and manner agreeably to the reasonable rules and regulations of the corporation.

Railroad corporations may make reasonable regulations as to the mode of their performance of their duties as carriers of passengers.

A rule established by the Concord Railroad corporation, a carrier of passengers between Concord and Nashua in this State, that tickets over its road should be dated on the day of their sale, and should only entitle each holder to a passage on that day, provided that joint tickets should be good for such further time as might be necessary to enable the holders, by the regular trains of the road, to reach the stations to which such tickets were sold, is not unreasonable.

Where the plaintiff, nearly a year after the establishment of such a rule by the Concord Railroad corporation, purchased a ticket from Chicago to Boston by way of that railroad, and having made part of the journey, voluntarily stopped for nearly four months at M., an intermediate station on the Concord Railroad: *Held*, that he was not afterwards entitled by his ticket to a passage from M. to Boston; also that it was not necessary that notice of this rule should be brought home to the plaintiff, even if prior to its establishment a usage known to the plaintiff had existed on the part of the corporation to allow such passengers to stop over at intermediate stations; and that a passenger desiring to know the regulations of the railroad in such respects should make proper inquiry.

Evidence, that conductors upon the Concord Railroad, in violation of their instructions from the corporation, had after the adoption of such a rule in various instances allowed tickets to be used contrary to its provisions, is not competent to show a usage on the part of the corporation in conflict with the rule, if such instances are not shown to have come to the knowledge of the governing officers of the corporation.

Usage is considered in the construction of contracts upon the ground, that, in the absence of express stipulations, parties are deemed to contract with reference to known existing usage.

In an action on the case against a railroad corporation, where the plaintiff in his declaration claims to recover solely for his removal from the cars and not on account of the manner of it, if a legal justification for the removal is shown, it is immaterial whether unnecessary force was used by the conductor in the removal.

CASE, for removing the plaintiff from a car of the defendant.

* Opinion delivered June Term, 1865.

The plaintiff introduced a deposition, taken at Chicago, August 6, 1862, of Henry C. Wentworth, who testified as follows :

I am and have been for about eight years, ticket agent of the Michigan Central R. R. at Chicago, Ill., which railroad runs from Chicago to Detroit.   [The following part of the deposition was introduced subject to the defendant's exception.]   Ever since I was in said business I have been accustomed to sell passenger tickets for the conveyance of passengers from Chicago to Springfield, Mass., Worcester, Nashua, Lowell, Concord, Boston, New York, and all the principal points in the east.   I cannot say whether the three tickets (annexed to the deposition) were sold by me or not, they have my stamp.   Both offices here have the same stamp and are under my control.   My impression is that I sold them.   Cannot say when, but suppose it must have been Oct. 17, 1860.   I think I sold them because they have my stamp ; they were sold as part of a set of tickets from Chicago to Boston, via Michigan Central, Grand Trunk, Northern N. Y., Vt. & Canada, Vt. Central, Northern N. H., Concord, Nashua & Lowell, and Boston & Lowell. We received a general authority to sell any ticket they sent us from Frazer, our general ticket agent.   That particular form or style of ticket we had not been in the habit of selling over a year, though we had been in the habit of selling over the same line about three years prior to, and ever since.   These tickets were sent us by Frazer.   I have heard reports of such tickets being refused by some of the railroads along the line above mentioned, but know nothing of the truth of it ; I mean to say I had no other authority than a general authority from Frazer and the Michigan Central R. R. Co., to sell all tickets they sent to the office here, and this was among the number.

The answer to int. 11, and all after int. 12, being objected to, were not read to the jury ; said deposition may be referred to in argument.

The tickets annexed to said deposition are printed on one piece of paper, and are as follows :

### BOSTON AND LOWELL RAILROAD.

One first class passage from Lowell to Boston.

G. 85.                    THOS. FRAZER,
                          Gen'l Ticket Ag't. Mich. Central R. R., Boston.

### NASHUA AND LOWELL RAILROAD.

One first class passage from Nashua to Lowell.

G. 85.                    THOS. FRAZER,
                          Gen'l Ticket Ag't. Mich. Central R. R., Boston.

### CONCORD RAILROAD.

One first class passage from Concord to Nashua.

G. 85.                    THOS. FRAZER,
                          Gen'l Ticket Ag't. Mich. Central R. R., Boston.

Each of said tickets is stamped on the back as follows :

## MICHIGAN CENTRAL R. R.

### Henry C. Wentworth, Oct. 17, 1860.

#### Chicago Depot.

The plaintiff introduced the deposition taken Nov. 10, 1862, of N. G. Upham, who testified: I was President of the Concord R. R. in October, 1860, and have held the office some four or five years. We had no contract with the Michigan Central R. R., but did have with the Northern (N. H.) R. R., as to the business of that road and Northern connecting roads as far as Ogdensburg. The Northern R. R. had authority to sell tickets over our road in 1860 and sometime prior thereto. Tickets were sold by agents of roads west of Ogdensburg that were received and taken up on our line, and adjustments were made as to those tickets with the Northern (N. H.) R. R. I think that practice has continued up to this time, except with instructions to our conductors not to receive tickets after a specified time from their date. I think the defendant has settled with the Northern R. R. for the tickets sold by that road and other connecting roads west as far as Chicago prior to Jan. 1, 1861. Oct. 24, 1859, the board of directors of the Concord R. R. voted "that as soon as practicable all tickets over the Concord, Manchester and Lawrence Railroad shall be dated on the day of the sale, and that said tickets shall only entitle the holder thereof to a passage on the day of sale, provided that joint tickets shall be good for such further time as may be necessary to enable the holder by the regular trains of the road to reach the stations to which said tickets were sold." It was also voted "that the president and superintendent be instructed to take immediate measures to carry the foregoing vote into effect." A circular was drawn up soon after, that was forwarded to the various roads as far as Ogdensburg, notifying these roads that tickets would not be received except in the manner specified in said vote. These circulars were signed by Mr. Gilmore, the superintendent of the road, and were sent soon after the passage of the vote. I think instructions were given by the superintendent to the conductors to carry out the vote. I have no personal knowledge that the Mich. C. R. R. agent at Chicago received any such circular.

The plaintiff testified as follows: Oct. 17, 1860, in Chicago, I bought tickets from there to Boston, over the Michigan Central, Ogdensburg, Northern N. H., Concord and others, and paid $26 for them. Three of them are annexed to Wentworth's deposition. Left Chicago in fifteen or twenty minutes after I bought them; stopped over about one train at Detroit, one train at Toronto, and one train or one day at Ogdensburg. Between Concord and Manchester I showed said three tickets to the conductor and he made no objection. I stopped at Manchester, Feb. 18, 1861. I attempted to use the tickets again to go from Manchester to Boston; soon after we left Manchester depot the conductor came round, I gave him the ticket; he said it was not good for anything; he did not say why it was not good for anything; he went around and came back and wanted to know if I would pay my

fare.  I told him I had bought a ticket once and I should not pay anything ; he said I must either pay or get out ; then he says, I'll put you out.  The cars soon stopped at Goff's Falls, and the conductor comes along and collars me ; he found he couldn't get me out and called for help.  One or two came and took hold of my legs and he hold of my collar and tried to pull me out.  When they turned me round into the alley way I got hold of the side of the arm and they couldn't pull it very easy ; the conductor took hold of my thumb with one hand and tried to unclinch my hold on the side of the arm of the seat and couldn't ; then he took hold with both hands and then he couldn't ; then he took hold of my fingers and pulled them off.  After they got my hand off from the side of the seat, they put me through the door pretty quick ; they finally got me out.  When we got to the door I bothered them some about getting me through ; they got it open and took me out on to the ground.

They strained my thumb so that it was lame three or four months, and pinched my arms up or knocked them against the sides somewhere ; my side was scraped, hit side of the seat or somewhere, it was all black and blue, and the blood settled ; it was some little time before it got well again ; it might have been some six weeks ; couldn't use my thumb any then ; it was swelled ; it was three or four months before it got well.

I had no notice, knowledge or information that the ticket would not be taken till I attempted to use it from Manchester to Boston.

The plaintiff testified as follows, subject to the defendant's exception :

In July, 1860, at Ogdensburg I bought a ticket from there to Boston and came to Manchester on it, and in December, 1860, went from here to Boston on it.  A year ago last fall I bought a ticket at Chicago over the same route to Boston ; stopped over here and then went to Boston on it ; might have stopped over here about a month then.  The tickets objected to in the present case, are the only ones that I ever had that were objected to.

On cross examination the plaintiff testified as follows :

When I bought this ticket I intended to stop at Manchester ; the conductor asked me to pay my fare or go out, and I wouldn't do either.  Did he treat you uncivilly or ungentlemanly?  Yes.  How?  He put me out of the cars.  Don't know as he said anything uncivil or ungentlemanly except saying that he should put me out of the cars.  I could have gone out without any trouble if I had chosen to, but I wouldn't.  I didn't care to go out.  I think he used more violence than was necessary ; I resisted all I could ; I calculated to stay and not to be put out if I could help it.

In what particular did they use more force than was necessary?  Ans. Don't you know?  No.  Then I shan't tell you.  In what particular did they use more force than was necessary to get you out of the cars?  Ans. I have been over that question a number of times.  Same question repeated.  Ans. They had no need to put me through quite so quick.  I was told by the conductor before I got to Goff's Falls that I must pay fare or leave the cars.  Don't recollect that I was so told at

Goff's Falls; when the conductor took hold of my collar he didn't hurt me; I was determined I wouldn't go out. The trouble about my thumb was at the seat on which I had been sitting; after they broke my hold there I might have caught hold of something else; suppose I landed on my feet; didn't show my injuries to a doctor or to anybody else; did nothing for my side; put some liniment on my thumb.

Theo. L. Hastings testified, subject to the defendant's exception, as follows:

I have been to Boston from Manchester, upon tickets purchased west of here, and which I bought here of others who had bought them north and west and who had come to Manchester upon them. I have done so before and since I heard of the plaintiff being put off the cars; no objection was made to such tickets. Some of them were not dated; I think I rode on some that were dated six months after their date. Since 1859 I have so rode, I should think, a dozen times, perhaps more; think the fare was $1.85, it is now $1.75.

Cross examination. Think I paid for them in boots, &c. Think I heard of one sold for $1.00. I rode on one about two months ago.

David Thayer testified, subject to the defendant's exception, as follows:

Within the last four years should think I had been from here to Boston a dozen times on tickets which I bought of people here, and which purported to have been bought west of here, and no objection was made by the conductors; have not within a year; went once about the time the plaintiff was ejected; some of them were dated and some not.

Cross examination. I used one more than a year old, and here is a part of it. It was six months old when I bought it. I bought it more than a year ago; this purports to be a Vt. Central ticket; think most of them were like this; can't say that I have ridden on a western ticket for three years.

Amos W. Sargent testified, subject to the defendant's exception, as follows:

In the fall of 1860, I bought a ticket at Ogdensburg, from there to Boston; stopped over here some time and then went on to Boston. Three-fourths of the year since 1850, I bought tickets west, and stopped here and then went to Boston without objection, only once since 1859. Other witnesses testified, subject to the defendant's exception, substantially that they had bought and used tickets as Hastings and Thayer had done.

N. D. Robie testified the plaintiff's thumb was swollen considerably; he couldn't work much on account of being lame and sore; did something but complained; it was some little time before he did a full day's work.

Aug. F. Hall testified, I saw Gilmore, the superintendent of the defendant, purchase three tickets of some Frenchmen, from the North or from Ogdensburg, to Lowell. They had bought them to go to Lowell but got work here and stopped, and Gilmore gave them $1 for them. It was about two years ago.

Cross examination. Gilmore didn't say the tickets were not good for

anything; he said that was all they were worth. It was about two years ago, I think not three years ago, last October. My impression is that it was two years, but it might have been three years ago.

The defendant introduced the following evidence: Joseph A. Gilmore testified: I am superintendent of the Concord Railroad, and was in 1859. I bought the tickets of the Frenchmen to show our directors how we were being imposed upon. I think the fare on the long routes through to Boston, was the same as to Manchester, on account of the competition of other lines of road. I showed the tickets which I bought of the Frenchmen to our directors on or before Oct. 24, 1859, and procured the passage of the votes of that date, and I notified all our conductors and other roads at once; this paper marked 385 is a copy of the order sent to Clough, one of our conductors, and the same order was sent to all our conductors—a printed list of instructions to conductors was issued January, 1860, like the paper shown marked A. They were posted up in all our depots and sent to all other roads with whom we had any business connections.

Cross examination. Think I sent the instructions to Ogdensburg and all roads this side. I supposed the regulations were enforced by our conductors. If they have not enforced them they have not done their duty. I have had no knowledge of any disobedience of the regulations.

The defendant proposed to introduce further evidence, but the court ordered a verdict for the defendant and the plaintiff excepted.

The deposition of Upham and Wentworth, and papers marked "385" and "A" are made a part of this case.

*Morrison, Stanley & Clark*, for plaintiff.

It does not appear that the plaintiff had any notice that the tickets in question would not be received, or that they did not conform to the regulations of the road. So far as the tickets are concerned, they were perfectly good for any time. We do not deny that the defendants had the right to make any reasonable regulations with regard to the use of tickets, but we maintain that unless those regulations were in some way brought home to the knowledge of the plaintiff, he is not bound by them. It appears, from the evidence reported, that it had been the practice of conductors to receive such tickets both before, on, and after Feb. 18, 1861.

All the cases reported, that we have been able to find, go upon the ground that the regulations of the road were brought home to the passenger in some way. If Wentworth had no authority to sell the tickets, still it was competent for the corporation to ratify his act, and upon the evidence reported it was competent for the jury to find such a ratification. The testimony of Hastings, Thayer, Sargent and Hall was admissible as showing that there was no regulation limiting the time within which the tickets should be used, or that there was no such uniform custom in regard to it as the defendants attempt to set up.

*George, Foster & Sanborn*, and *Eastman & Cross*, for defendant.

BARTLETT, J.*    Whether or not in the absence of evidence as to any regulations or usage of the defendants, the plaintiff, upon the purchase of a ticket from Concord to Nashua, would be held entitled merely to a continuous passage and by the next train, and whether he would have had legal ground of complaint if the cars had not stopped at Manchester, are questions that need not be considered in this case.    By the purchase of such a ticket from the defendants and payment for it the plaintiff would become entitled to be carried by the defendants over their railroad from Concord to Nashua; and if, in the absence of express stipulations, the contract on the part of the defendants should be held an agreement so to carry the plaintiff in a reasonable time and manner, the reasonableness must in general be determined with reference to other matters than the plaintiff's peculiar situation merely, for he could not properly claim to be thus carried except at such reasonable times as might be fixed by the corporation for the running of their trains between those places; and so the contract, which the ticket does not attempt to set forth in full, will be found in various other respects.

Ordinarily the ticket is not and does not contain the contract, *Quimby* v. *Vanderbilt*, 3 Smith (N. Y.) 313, *Nevins* v. *Bay State Co.*, 4 Bosw. 225, *Railroad* v. *Page*, 22 Barb. 132, *Railroad* v. *Bertram*, 11 Ohio (N. S.) 462, although it may furnish evidence of the contract, *Barker* v. *Clafflin*, 31 Barb. 556, *Brown* v. *Railroad*, 11 Cush. 101, *Railroad* v. *Proctor*, 1 Allen 268.    Practically, the only construction, that can well be given to the contract in such a case, is that it is an agreement by the defendants to carry the plaintiff from Concord to Nashua in a reasonable time and manner agreeably to their reasonable rules and regulations, if they have such, whether the same are established by formal regulation or by settled usage; and this is the reasonable manner in which the contract is to be performed; otherwise it might be a question for a jury in each case whether the passage was claimed or furnished in a reasonable time or manner, *Tyler* v. *Webster*, 43 N. H. 151; and if each case instead of being settled by some general rule were left to be determined upon its peculiar circumstances, the result would not only be found extremely inconvenient to the public, but public carriers, like our railroads, would be practically disabled to perform their duties in the transportation of passengers.    Public convenience, as well as the nature and necessity of the case, requires that such carriers should have the power to make reasonable regulations as to the mode of their performance of their duty as carriers, and where such regulations are made they so far establish definite rules of general application, which may obviate the necessity of submitting the question of reasonable time and manner to the jury in every individual case. *Tyler* v. *Webster*.    We find that similar views of the law have been taken elsewhere.    *State* v. *Overton*, 4 Zabriskie 435; *Cheney* v. *B. & M. R. R.*, 11 Met. 121; Redfield on Railways, 32; 1 Am. Law Reg. (N. S.) 7; and see *State* v. *Chovin*, 7 Clarke (Iowa) 204; *Railroad* v. *Vanatta*, 21 Ill. 189; *Day* v. *Owen*, 5 Mich. 520; *Railroad* v. *Dalby*, 19 Ill. 353.

* Perley, C. J., having been of counsel, did not sit.

Nearly a year before the plaintiff purchased his ticket, the defendants had established a rule that tickets over their road should be dated on the day of their sale, and should only entitle each holder to a passage on that day, provided that joint tickets should be good for such further time as might be necessary to enable the holders by the regular trains of the road to reach the stations to which the tickets were sold. This regulation seems designed to protect the corporation against fraud, to enable them to perform their duties as passenger carriers easily and properly, to facilitate their settlements with connecting roads, and to secure prompt and convenient transportation for the public, and it throws no real hardship upon the traveller, for if he desires to make two different journeys he may purchase a ticket for each. Therefore, considering these circumstances and the length and situation of the Concord railroad, we are of opinion that this regulation was not unreasonable. In the present case we have had no occasion to inquire how far such a regulation would be legally applicable to the case of a purchaser of a ticket, detained by inevitable accident or pure misfortune, and we have not examined that question.

This is not a case where the corporation seek to enforce a penalty or recover damages by virtue of a rule or by-law, and if the plaintiff had desired to know the regulation of the defendants in this respect, he should have inquired, *State* v. *Overton, Cheney* v. *B. & M. R. R.*, Redfield on Railways, 295, 296 and n., *St. John* v. *Nostrand*, 6 Hill 157; see *Bank* v. *Champlain Co.*, 23 Vt. 211, 212; and this could have been no greater hardship than the inquiries that passengers are daily obliged to make to learn the hours at which trains start and the like. Had the plaintiff shown that he was without information upon this subject, and that upon proper inquiries he obtained only a false answer, or could get no information, a case would have been presented that we have not here been called on to consider. The fact that in the present case the ticket was sold to the plaintiff by Wentworth at a distance can make no difference, for the receipt of their proportion of the passage money by the defendants can bind them no farther than a sale of the ticket by themselves would have done. *Schopman* v. *Railroad*, 9 Cush. 29.

If a regulation of the railroad can be shown by usage; see *Smith* v. *Railroad*, 44 N. H. 332, *Vedder* v. *Fellows*, 6 Smith (N. Y.) 126; and if it was competent for the plaintiff to show a usage of the road existing at the time he bought his ticket, such as would have governed the defendants in the future so far as their contract with him was concerned, yet we think he has offered no competent evidence of any usage existing at the time he purchased his ticket or while he held it, which would entitle him to ride in the defendants' cars by virtue of a ticket nearly four months old. If any such usage existed prior to the establishment of the regulation stated in the case, it then ceased to have effect as to future contracts, and there is no competent evidence of the existence of such a usage after the adoption of this regulation. The evidence of the plaintiff as well as of the defendants goes to show that the defendants' conductors were instructed to enforce this regulation, and

no question is made that such was the fact; and the instances testified to by the plaintiff and his witnesses where tickets had been used contrary to this regulation merely show that the conductors failed to do their duty, and have no tendency to prove a usage on the part of the defendants in conflict with this regulation, for the conductors had no power to repeal or alter it and no right to violate it, and these instances are not shown to have come to the knowledge of the governing officers of the corporation; and the tickets thus misused cannot be presumed to have been received as valid by the conductors with the assent of the corporation, for such a reception of them was not within the scope of the authority of the conductors and was in disobedience to their positive instructions. *Martin* v. *Great Falls Co.*, 9 N. H. 51; *Tebbets* v. *Moore*, 19 N. H. 371; *Beebee* v. *Ayers*, 28 Barb. 283; and see *Smith* v. *Railroad*, 44 N. H. 332; *Elkins* v. *Railroad*, 23 N. H. 287; *Murch* v. *Railroad*, 29 N. H. 9.

But it has been urged that the evidence tended to show a usage by the defendants to allow passengers "to stop over," existing for some time immediately prior to the adoption of the new regulation; and that the plaintiff, knowing that usage but having no information of any change, could not be affected by the new regulation; but we think this latter position is founded upon a mistake.

If the contract is to be deemed an agreement by the defendants to carry in the usual manner, to the usual terminus and with the customary stops, *Cheney* v. *Railroad*, Story Bail. secs. 597, 600, Angell on Carriers, secs. 531, 533, 5 Petersd. Abr. *48 n., we need not inquire whether this is anything more than an agreement to carry according to their reasonable regulations, for at most it is in each of these cases but a contract to carry according to the reasonable usage, upon the ground that in the absence of any special agreement the parties are deemed to have contracted with reference to the established existing usage. *Foye* v. *Leighton*, 22 N. H. 76; *Farnsworth* v. *Chase*, 19 N. H. 534. It would introduce a most unnecessary and unprofitable embarrassment into the conduct of the business of such public carriers, if they were always to be bound by a usage, because it had at some former time existed, as to every person who had ever known the usage, unless notice of a change is brought home to him; and it would create such practical difficulties in the performance of their duties by railroads as would in effect render them profitless to their owners and useless to the public. The recurring changes of travel and the frequent exigencies of business, for which provision must be made, are such that the changes essential to the public accommodation could hardly be made if railroads were thus hampered; and it would seem that our legislature deemed it necessary by statute to forbid the increase by railroads of their rates of fare without notice. Laws 1852, ch. 1277, sec. 1.

Notice, unless brought home to the passenger, can be of no real consequence in such a case. It might be suggested, that, in a case like the present, it would be quite practicable to endorse some notice of the change of rule upon the ticket; but when we take into account the number of the changes of different regulations important to travellers,

that may become essential to convenient and safe transportation, and the frequency of their necessity, we think it can hardly be practicable to place notices of all such changes upon the ticket, and if it were, it would be far from insuring actual notice to all passengers. It seems to us that such a requirement would not prove of sufficient practical value to counterbalance its inconveniences. If it is understood by the public that the duty is on the traveller to inquire as to all such reasonable regulations as it may be important for him to know, we think there will result less inconvenience than from any holding of the law that tends to relieve the traveller from the duty of inquiry as to a part of such matters of regulation. The public would be quite as likely to be misled, if they were induced to rely upon the probability of seeing notices, not necessary to be brought home to the knowledge of individuals, as if they understood that the duty of inquiry rested upon the person desiring to know. Besides if knowledge of the notice is not necessary to be brought home to the individual, but only a reasonable publication of it is required, then a party is held charged with notice in effect upon the ground that he might have ascertained the change by reasonable inquiry, and we see no good reason why he may not as properly be held to make such inquiry of the proper officers or servants of the carrier corporation as among notices reasonably published in newspapers and hand-bills.

Usage is considered in the construction of such a contract, solely because, in the absence of express stipulations, parties are deemed to contract with reference to the known existing usage ; and if the usage has ceased at the time of the contract the reason of the rule fails, and the contract is not ordinarily deemed to have been made with reference to the abolished usage. *Cookendorfer* v. *Preston*, 4 How. 317. And so in *Walker* v. *Jackson*, 10 M. & W. 161, the jury found the existence of "an invariable usage and custom ;" but the real question in that case was how far the defendants were carriers ; and it was decided that if they habitually held themselves out as carriers to a certain extent, (which was shown by their usage,) they could not divest themselves of the ordinary common law liabilities of such carriers by a notice like that shown in the case ; so that the question was not as to the necessity of notice of reasonable regulations established by them for the performance of their carrier duties, but of their power to relieve themselves of part of their common law liability and duty as carriers by such a notice.

If, then, the former usage made no part of the contract, it could not be operative in the present case unless by way of estoppel. But here the defendants, by the performance of their daily duty, cannot be taken to have so conducted as to induce a reasonable man to believe that they would at any future time maintain the same regulation ; *Drew* v. *Kimball*, 43 N. H. 285 ; and the plaintiff's conduct cannot properly be said to have been influenced by any intentional act or neglect on 'their part. As we have seen, the plaintiff is presumed to have contracted with reference to the reasonable regulations of the railroad ; *Beebee* v. *Ayers*, 28 Barb. 280 ; and of these no notice was necessary in a case like this. *Cheney* v. *B. & M. R. R.;* and the same reasons would seem to ex-

ist for holding that no prior notice of a change of regulation was essential, because the duty of inquiry was on the plaintiff.   Indeed, where the necessity for change of such regulations is so obvious and their frequency so notorious, a passenger who neglects to make any inquiry can hardly have good ground for complaint because of his ignorance of the new regulation.   *Odlin* v. *Gove*, 41 N. H. 463.

The numerous cases as to the power of common carriers to limit their common law liability are distinguished from the present; for, as the carrier cannot divest himself of his common law responsibilities unless by a special contract, his own act alone must be insufficient to relieve him from such duties while he remains a common carrier.   *Moses* v. *B. & M. R. R.*, 24 N. H. 71; but he may and must in many respects regulate the mode in which he is to perform those duties.   *Ib.* 90, *Day* v. *Owen*, 5 Mich. 525; and so of inn-keepers.   Nor are the cases, where a known partner has been held liable for the debts of the firm contracted after his retirement, in point here, for they can be explained upon the ordinary ground of estoppels in pais.   Story Part. sec. 160.

In the present action on the case the plaintiff claims to recover simply for his removal from the cars, and not on account of the manner of his removal, and, as he refused to pay his fare, his removal was perfectly justifiable.   Laws 1852, ch. 1277, sec. 3; *Hilliard* v. *Gould*, 34 N. H. 240.   As a complete answer in law to the cause of action set forth in the declaration appears, the plaintiff cannot recover in this action, and therefore we need not examine the questions, whether, if more force was used in the removal of the plaintiff by the conductor, not through mere carelessness or negligence, but wilfully and intentionally, the defendants would be liable for such excess in any action; see Story's Agency, secs. 452–456 & n., *Hibbard* v. *Railroad*. 1 Smith (N. Y.) 456, *Sanford* v. *Railroad*, 9 Smith (N. Y.) 343, *Hewitt* v. *Swift*, 3 Allen 420; or whether, if liable at all in such case, they would be so in this form of action.   See *Savignac* v. *Roome*, 6 T. R. 125; *McManus* v. *Crickett*, 1 East 106.

There must be

*Judgment on the verdict.*

BELLOWS, J., dissenting :—

I am compelled to dissent from my brethren for the reasons which I shall proceed to assign.

The ticket which the plaintiff purchased at Chicago entitled him to a passage from there to Boston over defendants' road among others; and as it was silent as to the time, mode, and manner of transporting him, and as there was no evidence of any special contract with the plaintiff on the subject, the whole must be left to usage, in view of which the parties must be supposed to have contracted.   So that the defendant must be deemed to have contracted to transport the plaintiff in such time, mode and manner as accorded with the usage upon that route, as much as if it had been so expressed in the ticket.

By this usage, then, is to be determined when he shall be so trans-

ported, whether by a continuous or interrupted passage, with or without pauses for rest or refreshment, or with or without the privilege of stopping on the way, over one or more trains, for business or rest; and also the kind of seat or car he shall occupy.

On these and other points, in the absence of express stipulations, the meaning of the contract is fixed by the usage, if any exist. 2 Starkie Evi. 453; 2 Kent's Com. 759–*566; Story's Conflict of Laws, 225, 233; *Loring* v. *Gunning*, 5 Pick. 15; *The Schooner Reeside*, 2 Sumner's C. C. R. 567; Angell on Cor. sec. 299; *Swamscott* v. *Partridge*, 25 N. H. 376, and cases.

Accordingly it is held, that, if the usual place of alighting from a coach, is at the *inn yard*, the passengers cannot be compelled to get out at the inn gate, even. *Dudley* v. *Smith*, 1 Camp. 167. And if the custom is to carry the passengers to their own homes or lodgings in a particular place, that must be conformed to. Story on Bail. sec. 608; Angell on Car. p. 508, and cases; 5 Petersdorf Abr. Carriers, p. 48.

So they are bound to allow the usual intervals for refreshments; and they cannot, at their caprice, vary or annul their accommodations; for every passenger is understood to contract for the usual reasonable accommodations. Story on Bail. sec. 597, Angell on Car. 508, where it is said that this usage may be the very reason for preferring that particular conveyance to the less accommodating arrangements of another line.

So, where an express company is accustomed to deliver packages at the places of business, or houses of the consignees, in a particular place or city, this must be regarded as part of the contract; and the carrier's responsibility will continue until such delivery. Redfield on Railways, p. 249.

So, if it be the usage to deliver at a certain depot in the business centre of a large city, the passenger's ticket will, I apprehend, entitle him to be transported to that depot, and the obligation of the railroad will not be discharged by leaving him at a station substantially short of that point, although within the limits of that city. This, indeed, would be within the rule applied to stage coaches before cited.

The usage, however, which is to govern must be so long and so well established as to become known, so that the parties may reasonably be supposed to contract in reference to it. *Farnsworth* v. *Chase*, 19 N. H. 539, where the cases are collected and examined; and see *Gibson* v. *Culver*, 17 Wend. 311, 312.

In *Foye* v. *Leighton*, 22 N. H. 76, it is said that the usage must be so long continued, so well settled, and so uniformly acted upon, as to raise a fair presumption that it is known to both contracting parties, and that they contracted in reference to it and in conformity with it.

In the case before us the jury might have found a usage to allow the passenger to stop on the way, over one or more trains, or even for weeks or months, and if so, that the contract was in reference to it, and in fact incorporated that privilege into it.

Independent of the by-law, the jury might clearly so have found it,

and down to the time of the sale of the ticket in question, that is, Oct. 17th, 1860.

So I think the jury might have found such a usage existing Oct. 24, 1859, the day the by-law was made; and the proof tended to show that the usage continued after that the same as before, until the plaintiff was put off the defendants' cars.

Unless this usage, then, was changed by a by-law not communicated to the plaintiff, nor to the office where he purchased his ticket under defendants' authority, or posted therein, or noted upon the ticket, the verdict must be set aside because it was directed by the judge.

This raises the naked question whether a party contracting with a railroad for a passenger ticket is bound by a change in a usage before established, made by a by-law not communicated to him, not notified at the office authorized to sell tickets, and where plaintiff bought it, or notified on the ticket itself; or, in other words, whether the railroad is bound to give notice of such change in some way, or whether the passenger must take notice of it at his peril, or is at least bound to inquire.

And, in this aspect of the case, it is immaterial whether the ticket was purchased one day, or one year, after the by-law in question; because, if proper notice of it was not given, it could avail nothing, unless it was the duty of the passenger to inquire. Nor could the promulgation of the by-law to a portion of the offices authorized to sell tickets, affect the case unless of such character as to charge the plaintiff with notice.

The question, then, really is, whether an established usage may be abrogated by a by-law which has never been notified to the parties to be affected by it, or so far abrogated as to be inoperative if the passenger fails to make inquiries upon the point; or, in other words, is the carrier relieved from the obligation to give notice of such change unless the passenger make inquiries?

After a careful search, I am able to find no authority for such a doctrine, and I know of no principle that would give such effect to a by-law of a corporation not promulgated, any more than to a simple memorandum of an ordinary carrier which had never left his desk.

A usage once established must be deemed to exist until the contrary is made to appear, and if the rule or usage is changed by the carrier, he must give notice of it to all concerned.

This, I think, is the rule applicable both to carriers of goods and passengers; and it is of universal application, unless, perhaps, in respect to changes which do not affect the interest or convenience of the passenger or consignor.

But when a rule affecting the substance of the contract and which has been long established, is changed by the carrier, common fairness requires that the carrier should use all reasonable means to give notice, by informing its agents, posting notices along the line, and at least in all the places where its tickets are to be sold, by publication in newspapers, and also, I think, by noting such change upon the ticket itself; and such, in fact, is the prevailing usage among carriers—a usage so universal as to furnish a strong argument for the position that the car-

rier is bound legally to give notice of such changes; and so I think are the authorities.

Accordingly it has been held that instructions to the captain of a steamboat accustomed to carry passengers and goods, wares and merchandise, not to carry money, will not avail as a defense, unless such instructions were published or brought home to the knowledge of the shipper; upon the ground that without such notice the master is presumed to have the *usual authority* of a master of a *general* vessel; *Allen* v. *Sewall*, 2 Wend. 327; the idea being, that, *prima facie*, the carrying of money was within the scope of such employment, and that the owners were liable unless notices were given to the contrary.

The same doctrine was applied in the case of money carried by a stage driver; holding that the proprietor was responsible unless the plaintiff had notice that the driver carried such packages on his own account. *Bean* v. *Sturtevant*, 8 N. H. 146.

So, in *Mayall* v. *Boston & Maine Railroad*, 19 N. H. 122, held that defendants were liable for the loss of a package sent by the passenger train, notwithstanding they had given instructions not to carry them by such train on the proprietor's account, but on account of the person undertaking to carry them; unless such instructions were known to the plaintiff or to the public generally, see p. 126, citing *Allen* v. *Sewall;* and Gilchrist, C. J., says no private instructions or agreements between the corporation and their servants, not published to the world at large, nor communicated to the plaintiff, could affect his right to recover.

A by-law of a railway company under the provisions of a special act, and which purports to limit their liability for loss in certain cases, will not bind the customer, unless there be evidence that he had notice thereof; Ch. on Contracts, 491–*424, citing *Great Western Railway Co.* v. *Goodman*, 11 Law & Eq. 546, where there was a by-law limiting the amount of baggage for first and second class passengers, but providing that the company would not be responsible for the same unless booked and paid for accordingly: Held, as it would seem, that the company would be liable unless the knowledge of this by-law was brought home to the plaintiff.

So, in Chitty on Con. 492–*420, it is said to be now perfectly well understood, that if a parcel be delivered to a carrier to be carried, it is his duty to ask such questions as may be necessary, and if he do not, and there be no fraud to give the parcel a false complexion, he is bound to carry it as it is. So is *Walker* v. *Jackson*, 10 M. & W. 169, where plaintiff went upon the defendant's ferry boat with a phaeton and a box of jewelry under the seat, and it was injured; the defendant objected that the plaintiff did not disclose the jewelry. But the court held that it was perfectly well understood, that, if anything is delivered to a person to be carried, it is the duty of the carrier to ask such questions as may be necessary; and if he do not he must carry it as it is, unless there be fraud.

So in *Jordan* v. *Fall River Railroad*, 5 Cush. 74, it was held that a passenger is not bound to give notice of the contents of his trunk un-

less inquired of.  So is *Phillips* v. *Earle & al.*, 8 Pick. 184, the court, Parker, C. J., saying that the information was not necessary, no notice limiting the liability having been given.

Upon the same principle the passenger is not bound to inquire if the carrier has changed his rules; but it is for the carrier to give the passenger notice of it, or he has a right to consider the old rules in force. If no questions are asked and no fraud, and no notice limiting his liability, the carrier will be liable, for it is his duty to ask the necessary questions.

In England and some of the States of this Union, it has been held that a carrier might qualify his common law liability for goods, by a notice to that effect—as by requiring the value of goods of a certain description to be stated, and beyond a certain amount, to be paid for, or else that the carrier would not be liable; but it has always been held that the notice must be brought home to the consignor; and that taking a newspaper with such notice is not enough, without showing that it was read by him.   Ch. on Con. 499, 500, *429, and note of American cases; *Rowley* v. *Howe*, 3 Bing. 2.   The power to make these qualifications as to certain things, such as money, jewelry, securities, &c., is recognized by act of Geo. 4, and Will. 4, ch. 168, and provision made for the notice; but, in respect to all other kinds of goods, the power thus to limit the liability is denied.   In *Moses* v. *B. & M. Railroad*, 24 N. H. 71, it is held that a carrier cannot by a general notice discharge himself from his legal liability to answer for goods, but at the same time, Perley, J., says that. when the carrier gave notice that he would not be liable for cash unless he had notice, and was paid in proportion, he hardly claimed anything more than the fair application of the rule; see p. 86.

These decisions are in point, as showing that, when the obligation or duty at common law is attempted to be changed, the carrier must give notice, not that the consignor must inquire.

The extent of a carrier's obligation to receive and carry goods, that is, as to the kinds he will carry, is determined by what he holds himself out as ready to do, or by his usage; but this he cannot change at pleasure without notice; else a person may incur expense in sending goods to his office or depot for carriage, and find a new rule established without notice, which compels him to seek other transportation.   This cannot be the law; on the contrary, the carrier is bound to carry what he professes to carry, or pay damages.   *Johnson* v. *Midland Railway Co.*, 4 Exch. 367.

Where a railroad company undertook to carry a passenger from Saratoga Springs to Albany, and a trunk was lost on a part of the way beyond the limits of their own road, which terminated at Schenectady, held that defendants were liable, and that if they designed to limit their liability to their own road, they should have given notice.   *Ward* v. *S. & S. Railroad*, 19 Wend. 537.

In *Brooke* v. *Pickwick*, 4 Bing. 218, Best, C. J., says, that if coach proprietors wish honestly to limit their responsibilities, they ought to announce their terms to every individual who applies at their office,

and at the same time to place in his hands a printed paper specifying the precise "extent of their engagement. If they omit to do this, they attract customers under the confidence inspired by the extensive liability which the common law imposes on carriers, and then endeavor to elude that liability, by some limitation which they have not been at the pains to make known to the individual who has trusted them." This is fully recognized in *Hollister* v. *Nowlen*, 19 Wend. 234. In the former case, a notice was put up in the office limiting the liability to £5, unless the parcels were booked and paid for.

This shows clearly that, where an attempt is made to vary the previous terms, the carrier should give notice, and unless he does, the customer has a right to assume that they are not altered. As to what shall constitute notice, see Angell on Car. sec. 248–250.

In *Walker* v. *Jackson*, 10 M. & W. 161, 172, which was a suit against a ferryman for injury to a box of jewelry in plaintiff's phaeton, while being landed from defendant's ferry-boat, it was a question whether it was part of the contract, that defendant should land carriages. To this plaintiff showed that such was the usage at that ferry, and obtained a verdict, and, on motion for a new trial, the court held that there was sufficient evidence of the usage, and denied the motion.

To meet this evidence on the trial, defendant offered a placard hung up on each side of the covered gate by which foot passengers entered the slip to go on board, announcing the rates of toll, and also that the proprietors did not undertake to load or discharge horses, carriages, &c., and "*that they would not in any wise be responsible for any loss thereof or damage thereunto.*" It appeared, however, that the plaintiff went down to the boat by another entrance than that where the notices were posted, and the court rejected the evidence; and, on the motion for a new trial, the whole court held it inadmissible, as there was no evidence tending to prove that plaintiff had seen the notices—such as having taken a paper containing it, or visiting a room containing it, and that it was of no avail that other persons had seen them.

Here there was a case of an attempt to control the effect of usage by notices not brought to plaintiff's knowledge; and this is precisely the case before us, as there is evidence tending to prove a usage, which, as the verdict was directed, must, for the purposes of this trial, be regarded as established. The case of *Walker* v. *Jackson* is exactly in point as it seems to me. It also decides that whether the defendant was to land carriages or not must depend upon the proof before the jury implied from usage or otherwise; but could not be inferred from the simple fact that defendant was a ferryman. Ferrymen are common carriers. Angell on Car. 182, and cases cited. Story on Bail. sec. 496.

The cases of notices that carriers will not be liable for cash, &c., unless notified and paid accordingly, seem to be in point. There, if they make such a rule, as they certainly may in England, and many of the American States, and even in New Hampshire, it would seem from *Moses* v. *Railroad*, 24 N. H. 86, (see also 2 Greenl. Evi. sec. 215,) it will still avail nothing without notice to the owners of the goods. The

carrier is to give the notice, not the owner, and if no notice is given he is not bound to inquire.

Where a coach proprietor posted a notice that he would not be liable for baggage unless paid for and put on to the way bill, said notice must be brought home to the plaintiff. *Bean* v. *Green & al.*, 3 Fairfield 422. The burthen of proof is on the carrier to show notice. 2 Greenl. Evi. sec. 216.

So, in the case of a partnership, if an ostensible or known member of a firm retires from it, he will still remain liable for all the debts and contracts of the firm, as to all persons who have previously dealt with the firm and have no notice of his retirement. Story on Partnership, sec. 160. This is put upon the ground that where one of two innocent persons must suffer from giving credit, he who has misled the confidence of the other, either by his misrepresentation or his negligence, ought to suffer instead of the other. In fact such person by neglecting to give notice continues to hold himself out as a partner.

Just so as to the common carrier; having once established rules or usages he must still be regarded as holding out to the public that such rules or usages exist, until he gives notice to the contrary to them who deal with him. The neglect to give such notice is a continual representation that such rules and usages exist.

As to an inn-keeper, if the goods of a guest by his request are left in the public room of an inn, still the inn-keeper is liable for their loss, unless he give the guest notice that he will not be responsible. *Packard* v. *Northcraft*, 2 Met., Ky. 439 ; 20 U. S. Digest, 139, sec. 215.

So a usage to deposit money and other valuables at the bar in a safe, will not affect a guest who does not so leave them, unless he had actual notice of such usage, and this is a question of fact. *Berkshire Woolen Co.* v. *Proctor*, 7 Cush. 417.

Again, notwithstanding the vote of the directors in October, 1859, there was evidence from which the jury might have found that the vote was disregarded, and the old usage still continued; see plaintiff's own testimony, and the testimony of Hastings, Thayer, Sargent and Hall, and perhaps others. If the usage still continued, then plaintiff had the right to stop on the way.

In *Great Western Railway Co.* v. *Goodman*, 11 Law & Eq. 546, there was no evidence that the by-law was carried into effect, and the court say it seems to have been treated as a dead letter, and it was proper to have left it to the jury.

Besides, in the case before us, the by-law does not contemplate that it shall be at once carried into effect, but as soon as practicable, and I think the jury might legally have found that the former usage still continued. If the by-law was laid out of the case as it must be, the jury might have found, and would have found, such usage, down to the time plaintiff bought his ticket.

Again, if no usage had been shown at all, the legal effect of the contract must have been to carry the passenger in a reasonable time, allow-

ing also reasonable stops on the way, to be determined as a matter of fact by the jury.

I am aware that there is some ground for an inference that when the plaintiff purchased his ticket he held himself out as going to Boston, when in fact he designed only to go to Manchester, and that he did so to induce the ticket master to sell him the ticket at less than the usual price to Manchester. If this were so, it would have been a fraud on the defendants, and they would have had the right to demand the customary fare to Manchester; but this fact was not passed upon, and therefore must be laid out of the case.

Upon these grounds I am compelled to dissent from the opinion of the majority of my brethren.